307 Ga. 171
FINAL COPY

S19A0644.  GREEN v. THE STATE.

BETHEL, Justice.

Following his conviction for the murder of Janice Pitts, Dewey Calhoun Green appeals from the denial of his motion for a new trial.[1] Green argues numerous alleged errors, including that the trial court erroneously excluded two expert witnesses.  Because we agree that the trial court abused its discretion in excluding the entire testimony of one of the expert witnesses, Sean Alexander, for Green's alleged

---

[1] The crimes occurred on June 25, 2014.  A Douglas County grand jury indicted Green on one count of malice murder, three counts of felony murder (for causing the death of Pitts by running her over, and while in the commission of an aggravated assault against Pitts' daughter and grandson), and three counts of aggravated assault (for assaulting Pitts, her daughter, and grandson with an automobile).  After an August 2015 trial, a jury found Green guilty of all charges. The court merged the felony murder counts and one aggravated assault count into the malice murder count, but then amended the sentence to vacate the felony murder counts. Green was sentenced to life in prison without parole for malice murder, and two consecutive twenty-year sentences for the two aggravated assault counts.
    Green filed a motion for new trial on August 26, 2015, and he amended that motion on August 29, 2017, and on July 6, 2018.  The trial court denied the motion (as amended) on October 22, 2018.  Green filed a notice of appeal to this Court on October 30, 2018, and this case was docketed in this Court to the April 2019 term.  The case was orally argued before this Court on August 20, 2019.

failure to comply with the requirement set forth in OCGA § 17-16-4 (b), we reverse.

1. This case calls for this Court to construe a provision of OCGA § 17-16-4. This particular provision has been the subject of few decisions by the appellate courts of Georgia. In pertinent part, the section provides:

> The defendant shall within ten days of timely compliance by the prosecuting attorney but no later than five days prior to trial, or as otherwise ordered by the court, permit the prosecuting attorney at a time agreed to by the parties or as ordered by the court to inspect and copy or photograph a report of any physical or mental examinations and of scientific tests or experiments, including a summary of the basis for the expert opinion rendered in the report, or copies thereof, if the defendant intends to introduce in evidence in the defense's case-in-chief or rebuttal the results of the physical or mental examination or scientific test or experiment. If the report is oral or partially oral, the defendant shall reduce all relevant and material oral portions of such report to writing and shall serve opposing counsel with such portions no later than five days prior to trial . . . .

OCGA § 17-16-4 (b) (2). In order to exclude expert witness testimony under this statutory provision, the State must clear two hurdles. First, as a threshold matter, the State must show that the statute

applies to the expert's testimony. If the statute does apply and the defendant fails to comply with OCGA § 17-16-4 (b) (2), then pursuant to objection and "upon a showing of prejudice and bad faith," the trial court may "prohibit the defendant from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances." OCGA § 17-16-6. See also *Murphy v. State*, 299 Ga. 238, 244 (3) (787 SE2d 721) (2016) (party seeking to exclude evidence under OCGA § 17-16-6 has the burden to show prejudice to the movant and bad faith by the party that failed to comply with OCGA § 17-16-4). We review the trial court's decision for an abuse of discretion. See *Murphy*, 299 Ga. at 244 (3).

2. Viewed in the light most favorable to the verdicts, the evidence presented at trial shows the following. On June 25, 2014, Pitts was driving her SUV with her daughter and four-year-old grandson as passengers southbound on Highway 5 in Douglasville. As Pitts was switching from the left lane to the turn lane on a slight downhill, Green rear-ended her SUV. Pitts' daughter described the

3

collision as not just a single hit by Green's truck, but rather a series of hits. Pitts and her daughter exited Pitts' SUV to survey the damage. Pitts' grandson, who was crying after the initial contact, remained in the SUV. When Pitts reached the back of her SUV and began examining it, Green's truck moved forward and hit Pitts, pinning her between the left rear corner of her SUV and the right front-end of his truck. Pitts' daughter was alongside Pitts' SUV when Green's truck hit her mother. Pitts' daughter then banged on Green's window in an effort get him to stop his truck. However, Green did not respond, and Pitts' daughter returned to the SUV in an effort to move it out of the way so that Green would stop crushing her mother. When her efforts failed, Green's daughter got back out of the SUV and started approaching the truck and her mother. However, Green backed up,[2] drove partly over a curb, and ran over

---

[2] There were as many versions of the story as there were witnesses. However, some commonalities exist. Namely, at least 15 witnesses testified to the events they witnessed immediately surrounding the collision. Nine witnesses testified that they saw Green back up in some form or fashion. At least one of these witnesses claimed to have seen Green's reverse lights, and another said he saw Green turn his head to look behind his truck before

Pitts, who had fallen to the ground. Pitts' daughter had to move out of the way of the oncoming truck. Green's truck then turned in front of Pitts' SUV and finally stopped on a hill in the grass in front of a nearby business. A man who witnessed the accident approached Green's truck, which had come to a rest on the hill, and shifted Green's truck into park. Police arrived on the scene and, after some investigation, arrested Green.[3] Pitts ultimately died from her

backing up. But four other witnesses said that Green's truck pushed against Pitts' SUV in a continuous motion, trapping Pitts and rolling her along her SUV until finally getting past it. Another witness recalled that Green's truck's left tire got pushed against the curb and stopped before the tire turned and Green's truck pinned Pitts against her SUV. When the tire turned again, the witness saw Pitts fall. An additional witness who observed the accident did not see Green back up. Thus, nine witnesses indicated that they saw Green's truck back up and six did not testify to seeing Green's truck back up.

[3] Green was described as not being particularly emotional immediately following the accident. Various witnesses, including police, described him as apparently uninjured and responsive following the accident, although one witness who observed Green in his vehicle as it went up the grassy hill stated that he was "slouching to the side" and "looked unconscious." Another witness who checked on Green in his vehicle after the accident described him as "just sort of flailing," and testified that he did not initially respond to her voice. When he finally did turn toward the witness, he reportedly made an odd face, gritted his teeth, and looked "like something had come over him," though the witness did not believe he was having a seizure. However, a different witness who saw Green "shaking around" believed he was having a seizure. Another described Green as initially unresponsive to her voice, having a blank face, and "profusely sweating." A different witness also observed Green sweating profusely, and stated that Green was mumbling incoherently. After an officer got Green out of his vehicle, Green reportedly stated, "Oh, God, what did I do?

injuries.

On June 11, 2015, the parties appeared before the trial court to address the prosecution's request for reports and other medical records. At that hearing, the prosecutor requested "that the Court put a deadline on [defense counsel] for the evidence that he intends to bring forward so that I have ample time to examine and respond to this evidence in advance to [sic] the August 4 trial date." The parties had been discussing the expert witness Green had at the time — Dr. Horatio Capote. Defense counsel responded to the prosecutor's request and stated that Dr. Capote had not yet issued a report because he had been waiting on medical records from some of Green's healthcare providers, but that defense counsel would ask him for an expedited report. The prosecutor then responded, "So June the 20th, Judge?" The trial court confirmed summarily a

What happened?" The officer noted that Green was confused and dazed. Another emergency responder testified that while Green did not have any obvious bruising or swelling, he complained of forehead and jaw pain. Bruising under Green's left eye was later noted during his jail intake.

"deadline date" of "June the 20th."[4]

On June 19, Green's defense counsel e-mailed the prosecutor to inform him that counsel was in the process of obtaining a neurologist to testify, and that all potential names of expert neurologists would be forwarded by the June 20 deadline via supplemental discovery. Sean Alexander, an accident reconstructionist, and Richard Franco, a neurologist, were listed as two of several "may call" witnesses in the supplemental discovery submitted by Green to the State on June 20, which the State acknowledged receiving. The disclosure included their contact information but did not include reports.

The prosecutor made some initial contact with these experts prior to trial.[5] On June 30, Green also filed an amended notice of an

_____

[4] Green did submit a report for Dr. Capote to the prosecution prior to trial.

[5] The prosecutor later represented to the trial court that when contacted, Franco indicated that he did not plan on providing a written report to the State on behalf of Green. Alexander testified at the motion for new trial hearing that when he was contacted by the prosecutor prior to trial, Alexander told the prosecutor that he was unsure whether he was being retained by the defense as an expert or a consultant, but that he would "get something over" to the prosecutor for Green once he confirmed that he was testifying as an expert

affirmative defense asserting amnesia, which Green claims summarized Alexander's opinion, although Alexander is not specifically named anywhere therein.[6]

On July 22, the prosecutor e-mailed Green's counsel and asked whether Alexander was going to testify, and if so, whether the prosecutor could get a copy of his report. Defense counsel responded that same day and confirmed that Alexander would be testifying as an expert at trial, that he was expected to explain the vehicle damage and unguided uphill path of Green's vehicle, and that defense counsel would be meeting with Alexander later in the week. Defense counsel did not otherwise submit any written summary of Alexander's or Franco's opinions to the State prior to trial or seek an extension of time to do so from the court.

The State finished presenting its case-in-chief at trial, and then moved to exclude Alexander and Franco from testifying based on Green's alleged failure to comply with OCGA § 17-16-4 (b).

(although he claims the State knew what his opinions were).

[6] The notice mentioned a mild traumatic brain injury that Green suffered during the accident and his subsequent loss of conscious control of the truck.

Thereafter, the trial court reviewed the e-mail correspondence between the parties to determine whether the correspondence complied with the statute and with the June 20 deadline the trial court had ostensibly given for Dr. Capote's report. The trial court noted that the e-mails broadly discussed the experts' opinions, but did not set forth the bases for the opinions and omitted other critical details specific to their opinions. The trial court further found the defense's failure to comply with the requirement for written reports pursuant to OCGA § 17-16-4 (b) to be intentional and prejudicial to the State, and excluded Alexander and Franco from testifying at trial.[7]

At trial, the State presented evidence that Green had trace amounts of sedatives in his blood and had been up late the night before the accident. It argued that he had acted intentionally in driving his truck into Pitts, although his judgment was impaired. The jury found Green guilty of all charges.

---

[7] Regardless of whether the June 20 date controlled the deadline for submitting Alexander's and Franco's reports, Green did not meet the statutory default deadline set forth in OCGA § 17-16-4 (b) (2).

At the motion for new trial hearing, Alexander testified that he examined both Green's and Pitts' vehicles, reviewed pictures taken at the scene and surveillance video showing the vehicles driving along a portion of the road, as well as a video of the vehicles taken by a bystander immediately following the collision, and made measurements of the vehicles and the scene which he then used to create three-dimensional maps. From this information, Alexander calculated a predicted speed for Green's truck and its path. Alexander also took a truck similar to Green's and, with the engine idling, let the truck roll from a stop along a path similar to that taken by Green's truck at the accident scene, noting its speed, which was comparable to the speed he had predicted based on his calculations.

Alexander intended to testify at trial that, following the initial collision between the vehicles, Green's truck was idling and on an uncontrolled path when Pitts was struck. More specifically, Alexander would have testified that the vehicle damage he observed indicated that after the initial impact, Green's truck had been idling

10

but moving forward against Pitts' SUV in a constant vibrating, slipping motion, creating the sensation of multiple impacts. At some point, Green's truck got stuck against the curb, and a V-shaped space between Green's truck and Pitts' SUV was created. While Pitts was standing in this space, the friction between the vehicles broke, "pivoting" Green's truck and crushing Pitts. After pushing past Pitts' SUV, Green's truck continued up a nearby hill until it lost its kinetic energy and stopped.

At that same hearing, Franco indicated that he intended to testify that Green lost consciousness after the initial collision between the vehicles and suffered a concussion and possibly a seizure.

3. Though not raised by Green as error, in accordance with this Court's general practice in appeals of murder cases, we have reviewed the record and find that the evidence, as summarized above, was sufficient to enable a rational trier of fact to find Green guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61

11

LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citations and punctuation omitted)).[8]

4. Green contends that the trial court erroneously excluded Alexander and Franco from testifying at trial. With respect to Alexander, we agree.[9]

Here, the parties and the trial court seem to have been operating under the assumption that a defendant's intention to present any expert testimony required the defendant, in this case Green, to make available or to serve a report summarizing the entirety of the expert's opinion under OCGA § 17-16-4 (b) (2). Thus, because Green did not do so with respect to Alexander, the trial court excluded the entirety of Alexander's opinion. However, that is

---

[8] Accordingly, the State may elect to retry Green. See *Johnson v. State*, 302 Ga. 188, 199 (3) (d) n.14 (805 SE2d 890) (2017).

[9] Because we find that the trial court committed reversible error in excluding Alexander, we need not address Green's contentions regarding the exclusion of Franco.

12

not what Georgia law requires.[10]  As provided by the plain language of OCGA § 17-16-4 (b) (2), the statute does not require a report to be prepared and made available or served unless a defendant intends to introduce in evidence in the defense's case-in-chief or rebuttal the results of "scientific tests or experiments."  Therefore, to the extent Alexander would offer testimony independent of any scientific tests or experiments, such testimony was not subject to the requirements of OCGA § 17-16-4 (b) (2).[11]

Alexander's opinion about the movement of Green's vehicle was based on various sources of information, only one of which could be

---

[10] By contrast, Federal Rule of Criminal Procedure 16, which includes language materially similar to OCGA § 17-16-4 (b) (2) in its subsection (b) (1) (B), was amended in 1993 to also require a defendant, "at the government's request, [to] give to the government a written summary of any [expert witness testimony] that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial" under certain circumstances.  Georgia's statute does not contain language encompassing the totality of an expert's testimony.  Rather, OCGA § 17-16-4 (b) (2) continues to apply only to expert testimony regarding the results of physical or mental examinations or scientific tests or experiments and opinions derived therefrom.  Civil discovery, by contrast, provides parties with a broad reach into the opinions and facts relied upon by any expert.  See OCGA § 9-11-26 (b) (4).

[11] The language in OCGA § 17-16-4 (b) (2) pertaining to a "physical or mental examination" is not applicable here because Alexander did not conduct a physical or mental examination of Green.

considered a scientific test or experiment for purposes of OCGA § 17-16-4 (b) (2). Alexander took a truck similar to Green's and, with the engine idling, let the truck roll from a stop along a path similar to that taken by Green's truck at the accident scene, noting its speed, which was comparable to the speed which he had already calculated based on other information. Assuming, without deciding, that this qualified as a scientific test or experiment,[12] then the trial court could prohibit Green from introducing into evidence only the results of that scientific test or experiment, as he failed to serve or make available the requisite report as required under OCGA § 17-16-4 (b) (2).

However, the State did not carry its burden in showing that OCGA § 17-16-4 (b) applied in the first instance, that Alexander's remaining testimony was dependent upon the results of this

---

[12] See, e.g., *Reed v. Heffernan*, 171 Ga. App. 83, 85 (1) (a) (318 SE2d 700) (1984), overruled on other grounds by *Brown v. State*, 274 Ga. 31 (549 SE2d 107) (2001) (in a car crash case, evidence of a separate accident at the same curve of road in similar weather conditions was the "substantial equivalent of a scientific test designed to show the probability of an incident occurring in the way asserted by an expert").

14

arguable "scientific test or experiment," and that he would not have been able to or would not have in fact given the same opinion without relying on these results. Although the State seems to argue that all of Alexander's testimony required a report, his opinion was based almost entirely upon information that was available to both parties and which did not convey the results of any scientific tests or experiments. More specifically, in formulating his opinion, Alexander reviewed pictures taken at the scene and video of the vehicles driving along the road, physically examined both Green's and Pitts' vehicles, and made measurements so as to create three-dimensional maps of those vehicles and the scene. Alexander used this information to mathematically calculate vehicle speed and to reconstruct the accident. Alexander's opinion was therefore based almost entirely upon his own observations and measurements of the available evidence, as well as application of established principles of mathematics and physics to those measurements, which did not constitute a "scientific test or experiment" requiring disclosure. See *Fortner v. State*, 932 P2d 1283, 1287 (Wyo. 1997). Alexander's

15

testimony at the motion for new trial hearing indicated that it was possible for Alexander to reach his opinion as to the speed and path of Green's truck without referencing the results from the roll-test he did of a similar truck, which yielded a speed close to that he had calculated based on the other information. Therefore, the trial court abused its discretion in excluding Alexander's entire testimony from trial.[13]

Moreover, under the circumstances of this case, the trial court's exclusion of Alexander was not harmless. See *Jackson v. State*, 306 Ga. 69, 80 (2) (c) (829 SE2d 142) (2019) ("[T]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (citation and punctuation omitted)). Alexander was an expert witness from whom

---

[13] In *Murphy*, 299 Ga. at 243 (3), we suggested that the State was required to provide timely notice of its expert's opinion to defense counsel before the State could elicit the expert witness' response to a hypothetical. Given the provisions of OCGA § 17-16-4 (a) (4), of course, this is true only when the expert's response was based upon "the results of [a] physical or mental examination or scientific test or experiment." OCGA § 17-6-4 (a) (4). We do not hold that an accident reconstruction expert never or always needs to provide a report under OCGA § 17-16-4. Our holding is instead based on the facts and circumstances of this case.

the defense intended to elicit crucial testimony at trial supporting the defense's version of events — specifically, how Green's truck could have taken the path that it did during the accident while uncontrolled by Green. Whether Green's actions were conscious and voluntary was the critical issue at trial. The State's evidence on that point rested almost entirely on the credibility of its expert witnesses and the observations of some of the witnesses at the scene. Alexander's testimony, which provided an alternative explanation for certain physical evidence (such as the marks on the vehicles and the path that Green's truck took) would have given weight and credence to the testimony of the witnesses who testified that Green appeared dazed and unresponsive or that he appeared to be experiencing some sort of medical event, as well as the defense's argument that Green was not consciously controlling his truck. It would also strengthen and explain the testimony of the witnesses who did not see Green back up, but rather observed Green's truck push against Pitts and her SUV in more of a rolling motion until finally getting past the SUV. Alexander's theory that Green's truck

17

was moving at an idling speed and was on an uncontrolled path would also be consistent with the uncontroverted evidence that a bystander placed Green's truck in park when it came to a stop on a slight incline. Moreover, Alexander's testimony regarding the sudden movement and change in direction of Green's truck after it became dislodged from the curb and crushed Pitts would provide the jury with an alternate explanation for many of the witnesses who claimed to have seen Green back up. Accordingly, we cannot say that it is highly probable that the erroneous exclusion of Alexander's testimony did not contribute to the jury's guilty verdicts.

5. In view of our disposition in Division 4, we need not address Green's remaining enumerations of error.

*Judgment reversed. All the Justices concur.*

DECIDED OCTOBER 31, 2019.

Murder. Douglas Superior Court. Before Judge Emerson.

*The Merchant Law Firm, John B. Merchant III, Ashleigh B. Merchant*, for appellant.

*Ryan R. Leonard, District Attorney, Sean A. Garrett, David H. Emadi, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Vanessa T. Sassano, Assistant Attorney General*, for appellee.