NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 24, 2023

S23A0783. ROOKS v. THE STATE.
S23A0801. CLARK v. THE STATE.

WARREN, Justice.

Appellants Joshua Rooks and Quatez Clark were convicted of malice murder and other crimes in connection with the shooting death of Christopher Dean.[1]  Rooks contends that the evidence

---

[1] Dean was killed on October 17, 2016.  In February 2017, a Fulton County grand jury indicted Rooks, Clark, Christopher Lockett, Jasper Green, Lamar Almon, Xavier Gibson ("Xavier"), and Orlando Gibson ("Orlando") for malice murder, three counts of felony murder, participating in criminal street gang activity, armed robbery, two counts of aggravated assault (one count for shooting Dean and the other for "striking him about his body with a wooden board"), tampering with evidence, concealing the death of another, and possession of a firearm during the commission of a felony.  Xavier was also indicted for an additional count of felony murder and for possession of a firearm by a convicted felon.

Rooks, Clark, Lockett, Green, and Xavier were tried together from March 19 to April 1, 2019.  Orlando's case was severed for trial, and Almon's charges were still pending when he testified for the State at the joint trial of the other five co-defendants.  The jury found Rooks guilty of all counts except one count of felony murder, the aggravated-assault counts, and the firearm count.  The jury found Clark guilty of all counts.  (The jury found Lockett guilty of all counts except the firearm count; the jury found Green guilty of all counts

presented at trial was legally insufficient to support his convictions and that the trial court erred by failing to grant his motion for a directed verdict of acquittal. Clark similarly contends that the trial court erred by failing to grant his motion for a directed verdict of acquittal on certain counts; he also claims that the court erred by failing to grant his motion for new trial on the "general grounds" set

---

except one count of felony murder, the aggravated-assault counts, and the firearm count; and the jury found Xavier guilty of all counts except one count of felony murder and possession of a firearm during the commission of a felony.) The trial court sentenced Rooks to serve life in prison for malice murder, 5 concurrent years for the gang-activity count, 10 concurrent years for armed robbery, 3 concurrent years for tampering with evidence, and a suspended term of 5 consecutive years for concealing a death. Rooks's felony-murder counts were vacated by operation of law. Clark was sentenced to serve life in prison for malice murder, 10 concurrent years for the gang-activity count, a consecutive life sentence for armed robbery, 10 concurrent years for the count of aggravated assault based on striking Dean, 3 concurrent years for tampering with evidence, 5 concurrent years for concealing a death, and 5 consecutive years for the firearm count. Clark's felony-murder counts were vacated by operation of law, and the remaining count of aggravated assault merged. The record shows that Orlando later pled guilty to several counts related to the crimes, including murder. The record does not indicate what happened to Almon's, Lockett's, Green's, or Xavier's cases, which are not part of these appeals.

Rooks filed a timely motion for new trial, which he later amended twice. Clark also filed a timely motion for new trial, which he also later amended. Following a hearing, the trial court denied Rooks's motion in October 2022; the court denied Clark's motion in March 2023, after a separate hearing. Rooks and Clark each filed timely notices of appeal. Rooks's case was docketed to this Court's April 2023 term; Clark's case was docketed to the August 2023 term. Both cases were submitted for a decision on the briefs.

forth in OCGA §§ 5-5-20 and 5-5-21 and by admitting under OCGA § 24-4-404 (b) ("Rule 404 (b)") evidence showing that he participated in another murder 11 days after Dean's murder and that he committed marijuana- and firearm-related crimes about two months after Dean's murder. As explained below, we affirm the convictions in both cases.

1. By way of background, the State's theory of the case was that Dean's former associate, Brian Dye, who—like Dean, was a drug dealer, and who was a member of the Gangster Disciples gang—directed Christopher Lockett to kill Dean; that Lockett lured Dean to a house on Sandy Creek Drive in Atlanta on the pretext of buying marijuana; and that Lockett recruited several of his associates, including Rooks, Clark, Jasper Green, Lamar Almon, Xavier Gibson ("Xavier"), Xavier's brother Orlando Gibson ("Orlando"), and Shakur Wright, to participate in Dean's murder. The evidence presented at the trial of Rooks, Clark, Lockett, Green,

3

and Xavier showed the following.[2]

(a) *The State's Case-In-Chief*

Dean and his associate Dye, a member of the Gangster Disciples gang, sold marijuana, and Dean often traveled to California to obtain his supply. In March 2015, he was arrested there on drug-related charges, which were eventually dismissed in August 2016 after he became a confidential informant and provided investigators useful information about his and Dye's suppliers in California. Later in 2015, Dean told Dye, who was then in prison in Georgia, about his cooperation with California law enforcement officials. Dye was unhappy with Dean's decision to cooperate, which resulted in a "falling out" between them. Two friends of Dean's testified that Dye had threatened Dean and his family, and that

---

[2] As noted in footnote 1 above, Orlando's case was severed, and Almon testified at the trial of the other five co-defendants. Dye and Wright were not charged in the indictment. The record indicates that about two years after trial, in 2021, Wright pled guilty to several counts related to the crimes, including murder.

4

Dean was afraid that Dye would kill him.[3]

Lockett, also known as "Tommy G," had often bought marijuana from Dean and Dye. Cell phone records showed that at 11:28 a.m. on October 17, 2016, Lockett's phone called a phone that was associated with Green, a member of the Gangster Disciples. A few minutes later, Dean's phone called Lockett's phone. One of Dean's friends testified that when he visited Dean at his house in Lithia Springs that morning, Dean was packaging marijuana for sale, saying that "Tommy G said he wants six pounds." At 12:04 p.m., Clark's phone called Wright's phone, and cell site location information ("CSLI") indicated that Clark's and Lockett's phones were near Lockett's house on Markone Street in Atlanta around that time. Dean's phone called Lockett's phone again at 12:41 p.m. Lockett's phone then communicated with Green's phone several times. Almon, who worked with Green at a funeral home in

---

[3] Dye testified that he was not a member of the Gangster Disciples and that he had not threatened Dean. To rebut Dye's denial of gang membership, the prosecutor tendered into evidence a March 2016 document from the Department of Corrections noting that Dye admitted gang membership and requested to be housed with a fellow Gangster Disciples member.

Carrollton, testified that after Green received a phone call at some point that day, Green asked if Almon "wanted to make some money." Almon agreed, and he and Green rode to Atlanta.

Surveillance video recordings from Lockett's house[4] showed that around 12:50 p.m., Lockett, Rooks, Clark, and a man who the prosecutor argued at trial was Wright walked out the back door of the house, and an Infiniti SUV and a Chevy truck—in which there was a driver but no passengers—backed out of the driveway.[5] CSLI indicated that Rooks's cell phone moved away from the area of Lockett's house around 1:00 p.m. The surveillance videos showed that meanwhile, around 1:10 p.m., the truck—which still contained a driver but no passengers—pulled back into Lockett's driveway, and moments later, Lockett went in the back door. At 1:22 p.m., Rooks's phone pinged off a cell tower near the house on Sandy Creek

---

[4] There were four exterior surveillance cameras at Lockett's house, which were positioned to video Lockett's back door, his driveway, the street in front of the house, and a cross-street.

[5] At trial, Lockett, Rooks, and Clark stipulated that they were at Lockett's house that day. A photo of Wright was admitted into evidence, and as discussed below, the jury observed Wright when he testified.

Drive in Atlanta, where Xavier lived with his brother Orlando, about 15 minutes away from Lockett's house. GPS data from Dean's tan Toyota Camry and CSLI from his cell phone indicated that Dean arrived at the Sandy Creek Drive house and called Lockett's phone at 1:32 p.m. Lockett's phone and Wright's phone then called Rooks's phone. CSLI showed that both Rooks's and Clark's phones were near the Sandy Creek Drive house around this time.[6]

The surveillance videos from Lockett's house showed that around 1:50 p.m., the Infiniti SUV returned; moments later, a black Dodge Charger pulled out of the driveway. CSLI from around this time showed that Rooks's phone was near Lockett's house. The surveillance videos showed that at 2:06 p.m., Green and Almon arrived and walked toward Lockett's house and out of view; a few minutes later, the Charger pulled in; and Lockett, Rooks, Green, and Almon went inside the house. Almon testified that when he and

---

[6] The prosecutor argued that this evidence showed that Rooks drove Clark and Wright in the Infiniti SUV to the Sandy Creek Drive house, while Lockett went somewhere in the truck and soon returned to his house.

7

Green arrived, Green spoke to a man, whom Almon did not know but identified at trial as Lockett. Lockett gave Green some money. Lockett then called Rooks and told him to pick up Green and Almon and to take them to the house "where the body was."[7] Rooks, whom Almon did not know but whom he identified at trial, then drove Green and Almon in a black Charger to the house on Sandy Creek Drive. The surveillance videos showed that at 2:11 p.m., Rooks, Green, and Almon walked out the back door, and the black Charger pulled out of the driveway. Around this same time, Rooks's phone called Wright's phone three times. Then from 2:16 to 2:31 p.m., Rooks's phone called Lockett's, Clark's, and Wright's phones several times; the calls to Clark were forwarded to Clark's voicemail. Around this same time, Rook's phone traveled from near Lockett's house back to the area of the Sandy Creek Drive house. Wright's phone called Rooks's phone back at 2:33 p.m.[8]

---

[7] Almon testified on cross-examination that he did not actually hear Lockett speak to Rooks during the call.

[8] The prosecutor argued that this evidence showed that Rooks dropped

Almon further testified as follows. Rooks dropped off Green and Almon at the house on Sandy Creek Drive, and Almon saw a "gold" Toyota in the driveway. Two men, whom Almon did not know but identified at trial as Xavier and Wright, came out of the house. They were not wearing shirts, were sweating, and seemed "paranoid." They told Green and Almon that "the body was already in the trunk," and "all [they] need[ed] to do [wa]s go inside the house and wipe down as much as [they] can and take the car and take it somewhere and burn it up." Xavier and Wright then left, running through the wood line behind the house. Green put on a pair of blue latex gloves and gave another pair to Almon. Green went in the kitchen, where he told Almon to come look at "[t]he blood and everything that was over there," but Almon went to a window to "keep an eye out." Green told Almon that the "dead" man, whom Almon later learned was Dean, was killed "because he was an

_____

off Clark and Wright at the Sandy Creek Drive house; drove the Infiniti SUV back to Lockett's house; left again and drove somewhere in the black Charger; and returned shortly thereafter to pick up Green and Almon and drive them to the Sandy Creek Drive house.

officer." After a few minutes, Green and Almon decided to leave, even though they had not "wipe[d] down" the house, and Green buried his and Almon's gloves in the backyard. They then got in the Toyota, and after Almon suggested that they abandon the car rather than burn it, Green drove to a MARTA station and parked the car. Green and Almon then walked away from the station, and Green later gave Almon $500. The GPS data from Dean's Toyota Camry confirmed that at 2:37 p.m., the Camry traveled from the house on Sandy Creek Drive to the Hamilton E. Holmes MARTA station, where the Camry parked at 2:48 p.m. Surveillance video recordings from the MARTA station showed that moments later, Green and Almon walked out of the station.

Surveillance videos from Lockett's house showed that the black Charger pulled into the driveway at 2:42 p.m., and Lockett, Rooks, Clark, and the man the prosecutor asserted was Wright went inside. Clark and the man the prosecutor asserted was Wright were not wearing shirts. Later that day, when Dean did not arrive to pick up his son, one of Dean's friends called Lockett to inquire whether Dean

10

had delivered marijuana to Lockett; Lockett responded that Dean "never showed up."

The next day, October 18, investigators found Dean's dead body in the trunk of the Camry at the MARTA station. An autopsy showed that he had been shot twice in the back of the head—once at contact range and once at an indeterminate range—which caused his death. He had extensive abrasions, lacerations, and skull fractures on the right side of his head, which were consistent with blunt-force injuries that occurred before he was shot. In the Camry, investigators found, among other things, papers showing Xavier's name, a crowbar, pillows (one of which had a bullet hole in it), a kitchen-style chair, part of a two-by-four piece of lumber, a sheet and comforter, a long-handled red dustpan, and several items of clothing. Testing later showed that a long-sleeved shirt found in the trunk contained DNA from Dean, Clark, and at least one other, unknown person; a white T-shirt found in the trunk contained Clark's DNA and the DNA of at least two other, unknown people; and a sweatshirt and jacket found in the trunk contained both

11

Xavier's and Dean's DNA, as well as DNA from other, unknown people.

Investigators reviewed a surveillance video from a store near the Sandy Creek Drive house, which showed that Xavier had purchased a long-handled red dustpan around 9:30 a.m. on the day of the murder. A few weeks after the murder, on November 10, 2016, investigators searched the Sandy Creek Drive house pursuant to a warrant. They found large amounts of blood in the kitchen, in a small room near the kitchen, on the back porch, and in the crawl space under the house. Testing later showed that blood collected from the scene belonged to Dean. Investigators also observed couch pillows and a kitchen-style chair that matched the pillows and chair found in the trunk of Dean's Camry. They found part of a two-by-four piece of lumber that was secured to a door; testing showed that the lumber found in the Camry originated from the lumber found in the house. Investigators noticed that the bed in Xavier's room had no sheets or comforter on it, and they found a comforter in another bedroom in the house that was similar to the one found in the

Camry's trunk. Investigators also found blue latex gloves buried in the backyard.

Investigators arrested Xavier on the day of the search; they arrested Green and Almon on December 5, 2016. On December 14, investigators arrested Lockett at a house on Joseph E. Boone Boulevard in Atlanta. Rooks and Clark were also there, and they were arrested on marijuana- and firearm-related charges after investigators found several guns, marijuana, cash, and scales associated with drug sales in the house. On December 30, investigators interviewed Clark; the interview was audio-recorded, and it was later played for the jury. During the interview, Clark initially said that he did not know anything about the murder, but he eventually admitted that he was present at the time of the shooting, saying that he was there "as a lookout"; he was looking out the back door of the house when he heard two gunshots; and he then ran through the woods, leaving his shirt at the house.

At trial, a gang expert testified that the Gangster Disciples was an "organized" gang; members of the gang considered cooperating

13

with law enforcement "snitching"; and an informant could be "assaulted" or "killed" for "cooperating with law enforcement." Another gang expert testified that the Gangster Disciples was a "structured and traditional type" of gang; respect was important to members of the gang; and most of the members of the gang sold drugs and committed other crimes. The State also presented evidence that Rooks sent an email using symbols and terminology typically used by the Gangster Disciples; that photos showed Clark and Green making hand signs associated with the Gangster Disciples; and that Xavier had a tattoo depicting Gangster Disciples' symbols and that he sent a text message using Gangster Disciples' terminology.

The State also presented testimony from a police officer that on October 28, 2016, 11 days after Dean's murder, Clark and Wright were involved in the shooting death of Benjamin Thompson and the beating of Johnny Caston during a marijuana deal at Lockett's house.

(b) *The Cases-In-Chief for Rooks, Clark, and Their Co-*

*Defendants*

During Lockett's case-in-chief, he presented testimony from Wright, who told the following story. On the day of the murder, Dean called Wright and arranged to purchase four ounces of cocaine, and Wright and Clark went to the house on Sandy Creek Drive, where they often hung out, to meet Dean. After Dean arrived, Clark went into the bathroom. Dean told Wright that he wanted the cocaine for a lower price than what they had agreed upon, and when Wright said, "No," they began to argue. Dean "swung" at Wright; Wright fought back; but Dean "got the best of [him]." Wright picked up a two-by-four piece of lumber and struck Dean four or five times. Dean then pulled out a gun, which Wright took and used to shoot Dean, who fell to the ground. Wright was afraid that Dean would continue to fight, so Wright put a pillow over Dean's face and shot him again. Clark then came out of the bathroom, and Wright said that he had shot Dean "to protect [him]self." Clark began to "panic." Green and Almon "showed up," and after Wright told them what happened, Almon told him to put Dean's body in the trunk of Dean's

car, saying, "I'll try to take it from here." Clark helped clean blood off the floor, and Clark, Wright, Green, and Almon put any items with blood on them in the trunk. Wright and Clark then fled; Rooks picked them up; and they went to Lockett's house, where Wright lived.

Green testified in his own defense and told a story similar to Wright's, claiming that on the day of the murder, he and Almon went to Lockett's house, where Green traded two cell phones for marijuana, and then got a ride from Rooks to the house on Sandy Creek Drive, where Green and Almon planned to hang out. There, Green encountered Wright and Clark. Wright said that he had just killed a man, and Almon offered to help Wright put the body in the trunk of a tan Toyota in the driveway. Green helped Almon put bloody items in the car. Wright and Clark then fled, and Green and Almon took the Toyota to the MARTA station and left it there. On cross-examination, the State presented evidence that during an interview with investigators, Green provided a written statement that—in contrast to his testimony at trial—was substantially

16

similar to Almon's testimony.[9]

Rooks also testified in his own defense, telling the following story. He was friends with Lockett, Clark, and Wright. On the day of the murder, he went to Lockett's house to work on his truck; he then gave Clark and Wright a ride to an apartment complex near Sandy Creek Drive so that Wright could visit a woman there. After he returned to Lockett's house and continued working on the truck, Green, whom he had seen at Lockett's house before, and Almon, whom he did not know, arrived and asked him for a ride to a house on Sandy Creek Drive where people often hung out and bought drugs. He dropped them off near the house and then went back to Lockett's house. He did not learn that Dean had been murdered until about two months later. He denied being a member of the Gangster Disciples, knowing Dean, or being involved in the murder. On cross-examination, he testified that after he dropped off Green and Almon, he called Wright and Clark, and Wright asked him to

---

[9] The video recording of Green's interview, which was admitted into evidence and played for the jury, is not included in the record on appeal.

pick them up at the apartment complex. When they got in Rooks's car, they were not wearing shirts, and Clark looked "shocked." Rooks's defense theory was that the State proved only that he dropped off Almon and Green and picked up Clark and Wright, which Rooks admitted, and that he did not have any knowledge of the crimes.

Clark elected not to testify. His theory of defense was that he was merely present at the house on Sandy Creek Drive when someone else—likely Wright—murdered Dean.

*Contentions Raised by Both Rooks and Clark*

2. In his sole enumeration of error, Rooks contends that the evidence presented at trial was legally insufficient to support his convictions for malice murder, armed robbery, tampering with evidence, concealing a death, and participating in criminal street gang activity; he also claims that the trial court erred by failing to grant his motion for a directed verdict of acquittal on those counts. Specifically, he argues that the evidence failed to prove that he participated in the crimes and instead showed that he merely

18

provided "rides" to Clark, Wright, Green, and Almon. Clark similarly claims that the trial court erred by failing to grant his motion for a directed verdict of acquittal on the counts of malice murder, armed robbery, aggravated assault based on striking Dean, possession of a firearm during the commission of a felony, and participating in criminal street gang activity. In this respect, he argues that because Wright testified that he killed Dean in self-defense, the State failed to prove that Clark participated in the crimes. Rooks and Clark do not prevail on these claims.[10]

The test established in *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), is the proper standard for evaluating the sufficiency of the evidence as a matter of constitutional due process and for evaluating whether the trial court erred by denying a defendant's motion for a directed verdict of acquittal. See *Fitts v. State*, 312 Ga. 134, 141 (859 SE2d 79) (2021) (explaining that "'[t]he

---

[10] Clark does not challenge the sufficiency of the evidence supporting his convictions for tampering with evidence and concealing a death. To the extent Rooks and Clark challenge the sufficiency of the evidence supporting the counts for which they were found guilty but not convicted, those challenges are moot. See, e.g., *Beamon v. State*, 314 Ga. 798, 801 n.2 (879 SE2d 457) (2022).

standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction'") (citation omitted).  Under that test, we view all of the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.  See *Jackson*, 443 U.S. at 319; *Fitts*, 312 Ga. at 141.  "This 'limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts.'"  *Muse v. State*, 316 Ga. 639, 647 (889 SE2d 885) (2023) (citation omitted).

In addition, "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."  OCGA § 16-2-20 (a).  A person is concerned in the commission of a crime if he, among other things, "[d]irectly commits the crime" or "[i]ntentionally aids or abets" in its commission.  OCGA § 16-2-20 (b) (1) & (3).  "'Conviction as a party

20

to a crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes.'" *Muse*, 316 Ga. at 648 (citation omitted). Mere presence at the crime scene, however, "'is insufficient to make someone a party to a crime.'" Id. (citation omitted).

Here, the evidence presented at trial, when properly viewed in the light most favorable to the jury's verdicts, showed that Rooks and Clark intentionally assisted Lockett and the other co-defendants in carrying out the plan to kill Dean because Dean was believed to be a police informant. Several witnesses testified that Dye, a member of the Gangster Disciples, threatened Dean after he learned that Dean provided information to investigators about his and Dye's marijuana suppliers in California. And the State presented evidence that Lockett, who had often bought marijuana from Dean and Dye, orchestrated Dean's killing, directing Rooks, Clark, Xavier, and Green, who were associates of the Gangster Disciples, to participate in the crimes.

21

In this respect, the CSLI, phone records, and surveillance videos from Lockett's house indicated that shortly before Dean was killed, Rooks drove Clark and Wright from Lockett's house to the Sandy Creek Drive house, where he dropped them off. Dean then arrived at the Sandy Creek Drive house; moments later, Lockett and Wright called Rooks; and CSLI indicated that Clark was near the Sandy Creek Drive house. While Dean was being beaten and killed at the Sandy Creek Drive house, Rooks drove back to Lockett's house, where he—at Lockett's direction—picked up Green and Almon and drove them to the Sandy Creek Drive house, making several calls to Lockett, Clark, and Wright; the calls to Clark were forwarded to Clark's voicemail. Rooks dropped off Green and Almon at the Sandy Creek Drive house, and Xavier and Wright instructed them to clean up the crime scene; take Dean's car, which contained Dean's body and other evidence of the crimes; and burn the car (although Green and Almon actually left it at the MARTA station). Rooks then picked up Clark and Wright, who had removed their shirts, near the Sandy Creek Drive house and drove them back to

22

Lockett's house. And investigators found two shirts in Dean's trunk that contained Clark's DNA.

Moreover, Clark initially lied during his interview with investigators—saying that he did not know anything about Dean's murder—but later admitted that he acted "as a lookout" during the crimes and that he heard two gunshots (though he claimed that he then fled). And Rooks testified that he drove Clark and Wright, and then Green and Almon, to the area near the Sandy Creek Drive house and that he later picked up Clark and Wright (though Rooks claimed that he was not involved in the crimes).

Based on its assessment of the evidence and the reasonable inferences to be drawn from it, the jury was authorized to reject Rooks's claim that he was merely an unwitting driver and Wright's story that he alone killed Dean in self-defense, and to conclude instead that Rooks and Clark shared a common criminal intent with their co-defendants to beat and kill Dean, take his car, and cover up the crimes. Accordingly, the evidence was sufficient as a matter of due process to authorize the jury to find Rooks guilty beyond a

reasonable doubt at least as a party to the crimes of malice murder, armed robbery, tampering with evidence, and concealing a death, and the trial court did not err by denying his motion for a directed verdict on those counts. See *Jackson*, 443 U.S. at 319. See also, e.g., *Muse*, 316 Ga. at 647-648 (explaining that to prove a defendant's guilt as a party to a crime, the State is not required to prove that the defendant personally fired at the victim); *White v. State*, 298 Ga. 416, 418 (782 SE2d 280) (2016) (holding that "[t]he fact that [the defendant] was merely the driver and did not actually fire the gun" that killed the victim did not undermine the legal sufficiency of the evidence, which showed that the defendant shared a common criminal intent with the shooter and was thus a party to the crime of malice murder). The evidence was likewise constitutionally sufficient to authorize the jury to find Clark guilty beyond a reasonable doubt at least as a party to the crimes of malice murder, armed robbery, aggravated assault based on striking Dean, and possession of a firearm during the commission of a felony, so the trial court did not err by denying his motion for a directed verdict on those

24

counts. See *Jackson*, 443 U.S. at 319; *Muse*, 316 Ga. at 648. See also, e.g., *Blackshear v. State*, 309 Ga. 479, 483-484 (847 SE2d 317) (2020) (holding that evidence that the defendant was near the crime scene around the time of the victim's murder, his fingerprints were found at the scene, and he admitted to investigators that he served as a lookout while others robbed and killed the victim was constitutionally sufficient to support his convictions for malice murder and robbery).

The evidence also was constitutionally sufficient for a jury to find Rooks and Clark guilty of the criminal street gang crimes of which they were convicted. To establish that Rooks and Clark participated in criminal street gang activity under OCGA § 16-15-4 (a), the State was required to prove four elements:

> (1) the existence of a "criminal street gang," defined in OCGA § 16-15-3 (3) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's association with the gang; (3) that the defendant committed any of several enumerated criminal offenses, including those "involving violence, possession of a weapon, or use of a weapon"; and (4) that the crime was intended to further the interests of the

25

gang.

*Blocker v. State*, 316 Ga. 568, 574-575 (889 SE2d 824) (2023) (citation and punctuation omitted).

With respect to the first element, gang experts testified, among other things, that the Gangster Disciples was a structured, "traditional" gang and that members committed an array of criminal activity, including drug trafficking, fraud, robbery, assault, and murder. See OCGA § 16-15-3 (1) (defining "[c]riminal gang activity" as committing several enumerated offenses, including racketeering and any crime that involves violence). As to the second element, the State presented evidence that Rooks sent an email using symbols and terminology typically used by the Gangster Disciples and that Clark made hand signs associated with the Gangster Disciples. And as to the third and fourth elements, as discussed above, the evidence indicated that Dye, a Gangster Disciples member, threatened Dean because he had provided information to investigators about certain marijuana suppliers and that Lockett, who had often bought marijuana from Dye and Dean, orchestrated Dean's killing with

26

Rooks and Clark. In addition, the State presented evidence that Gangster Disciples members considered cooperating with law enforcement "snitching" and that an informant could be "assaulted" or "killed" for "cooperating with law enforcement." The evidence presented at trial thus supported the jury's findings that the Gangster Disciples was a criminal street gang; that Rooks and Clark were associated with the gang; that by participating in Dean's killing, they committed a crime "involving violence, possession of a weapon, or use of a weapon"; and that they committed that crime to further the gang's interests. Accordingly, the evidence was sufficient to authorize the jury to find Rooks and Clark guilty beyond a reasonable doubt of participating in criminal street gang activity, and the trial court did not err by denying their motions for a directed verdict on that count. See *Blocker*, 316 Ga. at 575-576 (explaining that a "'nexus between the [criminal] act and the intent to further street gang activity . . . can be established by proof of the defendant's association with a gang and participation in its activities before and during the crimes charged'") (citation omitted); *Dixon v. State*, 309

27

Ga. 28, 34 (843 SE2d 806) (2020) (holding that a gang expert's testimony that the "Bloods," including its subset "Slime," was a criminal street gang; photos showing the defendant making Slime hand signs; and evidence that the defendant killed the victim to retaliate against him for disrespecting Slime, sufficiently established the elements of OCGA § 16-15-4 (a) and thus authorized the jury to find him guilty of participating in criminal street gang activity).[11]

*Contentions Raised Only by Clark*

3.   Clark claims that the trial court abused its discretion by

---

[11] Rooks also briefly claims that the evidence presented at trial was insufficient under OCGA § 24-14-6, which says "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." The circumstantial evidence in this case was consistent with the State's theory that Rooks was a party to the crimes, and it authorized the jury to exclude as unreasonable his hypothesis that he unknowingly assisted in the commission of the crimes by giving Clark, Wright, Green, and Almon "rides" to and from the Sandy Creek Drive house. The evidence was therefore sufficient under OCGA § 24-14-6 to support Rooks's convictions. See, e.g., *Muse*, 316 Ga. at 650 (explaining that "'where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law'") (citation omitted).

denying his motion for new trial on the "general grounds" set forth in OCGA §§ 5-5-20 and 5-5-21. See *Drennon v. State*, 314 Ga. 854, 860 (880 SE2d 139) (2022) ("Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is 'contrary to . . . the principles of justice and equity,' OCGA § 5-5-20, or if the verdict is 'decidedly and strongly against the weight of the evidence.' OCGA § 5-5-21.") (citation and punctuation omitted). But as we have explained, "'[t]he merits of the trial court's decision on the general grounds are not subject to our review,' and the decision to grant a new trial on the general grounds 'is vested solely in the trial court.'" *King v. State*, 316 Ga. 611, 616 (889 SE2d 851) (2023) (citations omitted). Thus, this claim presents nothing for our review.[12]

4. Clark also contends that the trial court abused its discretion

---

[12] Clark does not contend that the trial court applied an incorrect standard in reviewing his general-grounds claim. We also note that we need not determine in this case the propriety of our past practice of reviewing a general-grounds claim under the sufficiency-of-the-evidence standard set forth in *Jackson v. Virginia*, because as we concluded in Division 2 above, the evidence was constitutionally sufficient to support Clark's convictions. See *King*, 316 Ga. at 617 n.8. See also *Muse v. State*, 316 Ga. 639, 653 n.6 (889 SE2d 885) (2023).

by admitting evidence showing that he participated in another murder on October 28, 2016 (11 days after Dean's murder) and that he committed marijuana- and firearm-related crimes on December 14, 2016 (about two months after Dean's murder). Over Clark's objections, the trial court admitted this evidence under Rule 404 (b) for the purposes of proving his intent, motive, opportunity, and knowledge. As discussed below, we see no abuse of discretion in the admission of the evidence related to the October 28 incident for the purpose of showing intent under Rule 404 (b). And even assuming without deciding that the trial court abused its discretion by admitting the evidence of the marijuana- and firearm-related crimes on December 14, any such error was harmless.

(a) We first address the admission of the evidence of the October 28 incident. As mentioned above, at Rooks and Clark's joint trial with their co-defendants, the State presented evidence about the October 28 incident—in the form of testimony from a police officer who investigated the incident—showing that Clark and Wright were involved in the shooting death of Benjamin Thompson

30

and the beating of Johnny Caston during a marijuana deal at Lockett's house. The officer testified as follows. Around 9:00 p.m. on October 28, 2016, her supervisor notified her that a homicide had occurred at an address on Markone Street, and when she responded to that address—Lockett's house—she found Thompson's body in the kitchen. She reviewed the surveillance video recordings from outside the house, which showed that Lockett left the house shortly before Clark let Thompson and Caston in, and moments later, Clark and Wright pushed Caston out the door as they "pistol whipped" him. The officer's investigation indicated that Wright was the shooter; Wright was arrested while fleeing from the scene; and Wright and Clark were charged with crimes related to the murder.[13] On cross-examination, the officer testified that her investigation showed that Clark was "shock[ed]" by the shooting. In addition, Wright testified about the incident during his direct examination, claiming that he had arranged to meet Thompson at Lockett's house

---

[13] The police officer did not specify the crimes with which Clark and Wright were charged.

to buy children's clothing; when Thompson and Caston arrived, they pulled guns on him and tried to rob him; Wright grabbed his own gun; and as Clark struggled with Caston, Wright shot Thompson in self-defense.

(i) Under Rule 404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but such evidence is admissible for other purposes, including to prove intent, motive, opportunity, and knowledge. A party offering evidence under Rule 404 (b) must show three things:

> (1) the evidence is relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Kirby v. State*, 304 Ga. 472, 479 (819 SE2d 468) (2018). Clark does not dispute that the trial court properly concluded that the State met the third part of the Rule 404 (b) test, and we agree. Accordingly, we analyze below whether the evidence of the October

32

28 incident satisfied the other two parts of the test.

(ii) In evaluating the first part of the test, we look to OCGA § 24-4-401, which defines "relevant evidence" as evidence that "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevance "is a binary question—evidence is either relevant or it is not." *Kirby*, 304 Ga. at 480.

Here, Clark pled not guilty to the charged crimes and did not otherwise take affirmative steps to remove intent as an issue in the case. Indeed, Clark's claim that he was merely present when Wright or someone else killed Dean meant that the State had to prove that he shared a common criminal intent with his co-defendants so as to negate any non-inculpatory explanation for his presence at the Sandy Creek Drive house. See OCGA § 16-2-20 (defining parties to a crime). And Clark's participation in shooting Thompson and beating Caston during the October 28 incident involved the same sort of intent as some of the charged crimes, including malice

33

murder, felony murder based on aggravated assault, and the counts of aggravated assault based on shooting and striking Dean. Thus, the trial court did not abuse its discretion by concluding that the evidence of the October 28 incident was relevant to the issue of intent under the first part of the Rule 404 (b) test. See *Booth v. State*, 301 Ga. 678, 683 & n.3 (804 SE2d 104) (2017) (explaining that "[w]here the intent required for the charged offenses and other acts is the same, and intent is at issue, the first prong of the Rule 404 (b) test is satisfied" and noting that the appellant put intent at issue by pleading not guilty and asserting a mere presence defense). See also *Moon v. State*, 312 Ga. 31, 52-53 (860 SE2d 519) (2021) (concluding that evidence that the appellant committed a prior aggravated assault was relevant to prove his intent to commit with his co-defendant the charged crimes of aggravated assault and felony murder based on that crime, because the State was required to show that the appellant shared his co-defendant's intent to violently injure the victims or to place them in reasonable apprehension of immediately receiving a violent injury); *Frazier v. State*, 309 Ga.

219, 226 (845 SE2d 579) (2020) (explaining that to prove malice murder, the State must establish malicious intent and concluding that the appellant's involvement in a prior shooting was relevant to show that he had the malicious intent to kill the victim of the charged crimes).[14]

(iii) The second part of the Rule 404 (b) test is governed by OCGA § 24-4-403 ("Rule 403"), which says that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Because the primary function of Rule 403 is to "'exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect,' the trial court's decision to exclude evidence

---

[14] Because the evidence of the October 28 incident was relevant to prove intent, we need not decide whether it was also relevant for other purposes, as the trial court found. See *Thompson v. State*, 308 Ga. 854, 859 n.6 (843 SE2d 794) (2020). Clark does not contend that the trial court's limiting instruction, which told the jury it could consider the evidence for the additional purposes of proving motive, opportunity, and knowledge, was improper. See id.

under Rule 403 is 'an extraordinary remedy which should be used only sparingly.'" *Kirby*, 304 Ga. at 480 (citation omitted). "'Factors to be considered in determining the probative value of other act evidence offered to prove intent include its overall similarity to the charged crime, its temporal remoteness, and the prosecutorial need for it.'" *Mitchell v. State*, Case No. S23A0599, 2023 WL 5338775, at *4 (decided Aug. 21, 2023) (citation omitted). See also *Kirby*, 304 Ga. at 481.

Here, the October 28 incident and the charged crimes had significant similarities. In both cases, there was evidence that the victims arranged to conduct a marijuana deal and that at some point during the deal, Clark and Wright were involved in beating and shooting the victims, killing Thompson and Dean. Both incidents also involved Lockett's house as a sort of base of operations. On the other hand, there were also differences between the October 28 incident and the charged crimes. In the October 28 incident, there was no evidence indicating that the motive for the beating and shooting was retributive, whereas the evidence of the charged

36

crimes showed that Clark and his co-defendants killed Dean to punish him for cooperating with investigators in California. Even so, that difference was not so significant that it was an abuse of discretion for the trial court to conclude that the similarities gave the evidence of the October 28 incident substantial probative value. See *Mitchell,* 2023 WL 5338775, at *4. Nor was the significant probative value of the evidence diminished by temporal remoteness, as the October 28 incident occurred only 11 days after Dean's murder. See id. (noting that other-act evidence "carries more probative value where less time separates it from the charged offense").

The State's need for the evidence relating to the October 28 incident further strengthened its probative value. Clark's defense to the charged crimes was that he was merely present at the Sandy Creek Drive house when someone else—Wright—shot and killed Dean. By asserting that he was merely present and did not share his co-defendants' criminal intent to murder Dean, Clark made intent a crucial issue at trial. And although the other evidence of

37

Clark's guilt—which included evidence showing that he was with Lockett, Rooks, and Wright before and after the murder, he was at the Sandy Creek Drive house near the time of the murder, and his DNA was on clothing in the trunk of Dean's car—was not slight, the State had no direct evidence that Clark participated in the crimes other than his statement to investigators that he acted "as a lookout," but fled soon after he heard gunshots. See, e.g., id. (concluding that the State had an important prosecutorial need for other-act evidence to prove intent where the appellant argued that he was merely present at the crime scene and did not share the intent of the primary assailant); *Moon*, 312 Ga. at 56 (determining that the prosecutorial need for other-act evidence was significant because most of the evidence against the appellant was circumstantial and only his co-defendant had a motive to kill the victim, and evidence that the appellant shared his co-defendant's criminal intent was therefore "crucial" to proving the appellant's guilt).

On balance, the similarities between the October 28 incident

38

and the charged crimes, the close temporal proximity between the incidents, and the high prosecutorial need for the evidence provided significant probative value to the other-act evidence. And although the evidence that Clark had participated in another murder was highly prejudicial, the evidence was not a "'matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *Kirby*, 304 Ga. at 484 (citation omitted). See also *Thompson v. State*, 308 Ga. 854, 860 (843 SE2d 794) (2020) (explaining that "'[i]n a criminal trial, inculpatory evidence is inherently prejudicial; it is only when unfair prejudice substantially outweighs probative value that [Rule 403] permits exclusion'") (citation omitted). Moreover, the evidence of the October 28 incident was not overly emphasized at trial, and Clark elicited testimony from the police officer that supported his theory of defense—namely, that Wright was the shooter and that Clark was "shock[ed]" by the shooting. In addition, the jury learned that Clark was being prosecuted for crimes related to the incident. See *Strong v. State*, 309 Ga. 295, 311 (845 SE2d 653) (2020) (explaining that the fact that

the jury believed that the appellant had "escaped any punishment" for other crimes he had committed increased the risk that the jury would want to punish him for his past conduct rather than only for the charged crimes). And before the officer testified about the incident, the trial court gave the jury a specific instruction about the limited purpose of the other-act evidence, and we presume that the jury followed that instruction. See *Thompson*, 308 Ga. at 860. Under these circumstances, we cannot say that the trial court abused its discretion under Rule 403 by determining that the probative value of the other-act evidence was not substantially outweighed by undue prejudice. See id. See also *Kirby*, 304 Ga. at 484-485.

In sum, Clark has not established that the trial court abused its discretion under Rule 404 (b) by admitting the evidence of the October 28 incident. See, e.g., *Frazier*, 309 Ga. at 226-227; *Kirby*, 304 Ga. at 485.[15]

---

[15] In its order denying Clark's motion for new trial, the trial court concluded that the evidence of the October 28 incident was admissible as

(b) We now turn to the admission of the evidence about the December 14 incident, which showed that Clark was arrested (with Rooks) at a house on Joseph E. Boone Boulevard and charged with marijuana- and firearm-related offenses after investigators found several guns, marijuana, cash, and scales associated with drug sales in the house.

At a hearing on the admission of this evidence, the prosecutor argued, among other things, that the evidence was relevant for the purposes of proving Clark's intent, motive, opportunity, and knowledge, because Dean sold large quantities of marijuana and Clark was "in that lifestyle." Specifically, the prosecutor asserted

intrinsic evidence and because it satisfied OCGA § 24-4-418 ("Rule 418"), which says that evidence of a defendant's commission of criminal gang activity shall be admissible in a criminal proceeding in which he is accused of violating OCGA § 16-15-4, but that the State generally must provide notice of its intent to offer such evidence at least 10 days before trial. We note, however, that the State did not provide separate pretrial notice of its intent to offer this evidence under Rule 418, and some of us are skeptical of the State's argument in its briefing here that its pretrial notice of intent to tender this evidence for Rule 404 (b) purposes also satisfied Rule 418's notice requirement. But because we have concluded above that the evidence was admissible under Rule 404 (b), we need not decide whether the evidence was admissible for these other purposes. See OCGA § 24-4-418 (c) ("This Code section shall not be the exclusive means to admit or consider evidence described in this Code section.").

41

that the evidence showed that Clark had the intent and motive to rob Dean, "knowing that he [had] access to marijuana in large quantities;" that Clark had the opportunity to rob Dean, because "these co-defendants are all kind of in that lifestyle" and "they ha[d] the opportunity to be at the incident location on that date at that time"; and that Clark had knowledge of a "particularized sort of set of skills" "specific to that lifestyle, the lifestyle of selling marijuana and other drugs."[16]  Over Clark's objections, the trial court summarily ruled that the evidence of the December 14 incident was admissible.[17]

At trial, the prosecutor presented testimony from four investigators about the December 14 incident and introduced 35 photos of evidence seized from the house on Joseph E. Boone

---

[16] The prosecutor also confusingly argued that the other-act evidence showed that Clark had knowledge "that [the co-defendants'] action of intending to rob . . . Dean and all their other acts, sale of narcotics, et cetera, would be probative to show that they acted with knowledge."

[17] The prosecutor also sought to introduce this other-act evidence against Rooks and Lockett, and the trial court ruled that the evidence was admissible with respect to them as well.  However, Rooks does not challenge the admissibility of this evidence in his appeal.

Boulevard. First, an investigator testified that he assisted with executing a warrant at the house in order to locate and arrest Lockett, whose cell phone was pinging at that location, on charges in this case and that during a search of the house, he found five guns, including a handgun and a rifle that were hidden in an air vent, cash in the living room and in a freezer in the kitchen; an extended magazine for a semiautomatic pistol; bags of marijuana; and scales. The prosecutor then tendered into evidence 31 photos taken during the search, which included photos of the guns and cash in the areas in which they were found in the house and photos of the guns, cash, bags of marijuana, and scales set out on tables at a police station. Second, another investigator who assisted in the search testified that he found a gun in an air vent and a bag of cash in one of the bedrooms, and the prosecutor introduced four photos depicting that evidence. A third investigator testified as follows. When investigators arrived at the house and knocked, no one answered; investigators could hear people inside "running around," so they "threw a flash-bang" device; and then Lockett, Clark, and Rooks

43

came out of the house. Investigators found marijuana, cash, and a gun when they "cleared the house," so they arrested Clark and Rooks on marijuana- and firearm-related charges and obtained a warrant to search the house. Finally, another investigator testified that after the search of the house, Clark and Rooks were arrested "on drug and weapon charges" and that they were later charged with the crimes at issue in this case.[18] In addition, Rooks testified that Clark lived at the house on Joseph E. Boone Boulevard; Lockett sold marijuana; and Rooks knew there was marijuana in the house. The trial court did not provide a limiting instruction before the presentation of any of the evidence related to the December 14 incident, but the court later provided instructions about evidence of other acts before one of the gang experts testified and during its final charge to the jury.[19]

---

[18] Although, as noted above, Clark objected to the admission of the marijuana- and firearm-related evidence at the hearing on its admissibility, thus preserving this claim for ordinary appellate review, see, e.g., *Heard v. State*, 309 Ga. 76, 85 n.12 (844 SE2d 791) (2020), he did not raise any additional objections to the investigators' testimony or to the photos.

[19] Specifically, before one of the gang experts testified, the trial court instructed, in pertinent part:

Assuming without deciding that the trial court abused its

discretion by admitting the marijuana- and firearm-related

---

Sometimes evidence is admitted for a limited purpose. Such evidence may be considered by the jury for the sole issue or purpose against that party for which the evidence is limited and not for any other purpose.

In order to prove Count 1 of their case, the State must show participation in or association with a criminal street gang. To do so[,] the State has offered or will be offering evidence of other acts allegedly committed by one or more of the defendants. You are permitted to consider that evidence only insofar as it may relate to your consideration of the elements of the offense as to each of the defendants in this case and not for any other purpose. You may not infer from such evidence that any defendant is of a character that would commit such acts. The evidence may be considered only to the extent that it may show the elements that the State is required to prove in the crime charged in Count 1 . . . of the indictment for this case now on trial.

The defendants are on trial for offenses charged in the bill of indictment only and not for any other acts, even though such acts may incidentally be criminal.

During the final charge, the court instructed:

The State has offered evidence of other crimes, wrongs[,] or acts allegedly committed by a defendant. You are permitted to consider that evidence only insofar as it may relate to issues presented in the case and not for any other purpose. You may not infer from such evidence that the defendant is of a character that would commit such crimes. The defendant is on trial for the charges contained in this bill of indictment only and not for any other acts. Before you may consider any other alleged acts for the limited purpose as stated, you must first determine whether it is more likely than not that the accused committed the other alleged acts.

45

evidence, any such error was harmless. [20] "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.'" *Kirby*, 304 Ga. at 478 (citation and punctuation omitted). "'In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so.'" Id.

---

[20] Although we do not decide whether the trial court abused its discretion by admitting the evidence, we note that the evidence was *not* admissible to prove the Rule 404 (b) purposes that the prosecutor mentioned at the hearing. The evidence was not relevant to prove Clark's intent, motive, or opportunity to rob Dean of marijuana, because the indictment in this case did not allege that Clark and his co-defendants committed armed robbery (or felony murder based on that crime) by taking marijuana from Dean. Rather, the armed-robbery count alleged that they took Dean's "Toyota Camry motor vehicle." Nor was the evidence that Clark possessed marijuana and firearms with some of his co-defendants relevant to show that Clark had a "particularized sort of set of skills" "specific to . . . the lifestyle of selling marijuana and other drugs," as the prosecutor alleged. See *Pritchett v. State*, 314 Ga. 767, 777 (879 SE2d 436) (2022) (explaining that "'knowledge' under Rule 404 (b) refers to 'a special skill like safecracking, bomb-making, or document forgery or to specific knowledge based on past experience'" and holding that the trial court abused its discretion by admitting other-act evidence that the appellant had previously committed a shooting because the "incident provided no specialized knowledge to [the appellant] about how to shoot someone inside a house, nor does it support that [he] had any 'specific knowledge' based on the experience about how to shoot someone inside a house") (citation omitted). The prosecutor's focus on Clark's "lifestyle" was a classic, impermissible propensity argument. See, e.g., id. at 777-778 (concluding that the prosecutor's assertion that other-act evidence was admissible to show that the appellant had the motive "'to use violence to control anyone around him'" was an improper propensity argument).

46

(citation omitted).

The evidence that Clark committed the crimes of which he was convicted was strong. The surveillance videos from Lockett's house showed that Clark was with Lockett and Rooks shortly before Dean's murder; CSLI showed that he was in the area of the Sandy Creek Drive house around the time of the murder; and the surveillance videos showed that he was with Lockett and Rooks just after the murder and that he had removed his shirt. Clark's DNA was found (along with Dean's DNA) on two shirts that were in the trunk of Dean's car, with his dead body. And significantly, Clark initially lied during his interview with investigators but eventually admitted that he acted as a "lookout" during the crimes—an admission that itself defeated any assertion of "mere presence."

On the other hand, the State presented a significant amount of evidence about Clark's possession of marijuana and firearms on December 14, which had some prejudicial force. See *Strong*, 309 Ga. at 317 (explaining that when an appellant's trial for the charged crimes "devolve[s] into a series of mini-trials of him" for other crimes

47

he allegedly committed, it risks confusing the jury, distracting it from its task of determining the appellant's guilt as to the charged crimes, and unfairly prejudicing the appellant). But this prejudice was lessened for several reasons. First, the jury learned that Clark had been arrested on December 14 and charged with marijuana- and firearm-related crimes, thus limiting the risk that the jury convicted him of murder and the other charged crimes in this case to punish him for his possession of marijuana and firearms. See id. at 311. The prosecutor did not mention the marijuana- and firearm-related evidence during closing argument. See *Jackson v. State*, 306 Ga. 69, 80-81 (829 SE2d 142) (2019) (holding that the erroneous admission of evidence that the appellant participated in another shooting was harmless in light of the other strong evidence showing his guilt and the fact that there was no indication that the prosecutor emphasized the erroneously admitted evidence during closing argument). Moreover, the trial court instructed the jury that it could not infer from evidence that a defendant committed acts other than those alleged in the indictment that the defendant was "of a character that

48

would commit such acts," and we presume that the jury followed that instruction. See *Nundra v. State*, 316 Ga. 1, 8 (885 SE2d 790) (2023) (explaining that the trial court's instruction that the jury could not infer from other-act evidence that the appellant was "'of a character that would commit such crimes,'" lowered the risk that the jury would convict for the wrong reasons, even though the instruction "did not meaningfully explain for which permissible purpose the evidence was relevant"). In addition, the properly admitted evidence that Clark "pistol whipped" Caston and participated in Thompson's murder with Wright during a marijuana deal on October 28 made the jury aware that Clark had committed other marijuana- and firearm-related crimes, and that evidence was of a more violent nature than the evidence that Clark possessed marijuana and guns two months later. See *Kirby*, 304 Ga. at 487.

In sum, given the overall strength of the other evidence of Clark's guilt, it is highly probable that any error in the admission of the evidence showing that Clark possessed marijuana and firearms did not contribute to the jury's guilty verdicts. See, e.g., *Priester v.*

49

*State*, 316 Ga. 133, 138-139 (886 SE2d 805) (2023) (concluding that any error in the admission of evidence that the appellant committed an armed robbery and shot at a car during a drug deal on the day before he committed the charged crimes was harmless, given that the trial court instructed the jury that it could not infer propensity from that evidence and that the other evidence of his guilt was strong); *Nundra*, 316 Ga. at 6-9 (holding that any error in the admission of other-act evidence that the appellant committed armed robbery and hijacking a motor vehicle was harmless, because the evidence of his guilt was very strong, the jury learned that he had pled guilty to those crimes, and the trial court instructed the jury that it could not infer from the evidence the appellant's propensity to commit crimes); *Pritchett v. State*, 314 Ga. 767, 778-780 (879 SE2d 436) (2022) (acknowledging that the erroneous admission of other-act evidence regarding three incidents (which showed that the appellant committed aggravated assault and disorderly conduct and hit his girlfriend) "carried a risk of prejudice to [the appellant] in no small part because the State chose to emphasize the three prior

incidents through the first four witnesses that it called at trial," but concluding that the error was harmless because the evidence of the appellant's guilt was substantial, the prosecutor did not emphasize the evidence during closing argument, and the trial court instructed the jury as to the limited purposes for which it could consider the evidence).  Accordingly, this claim fails.

*Judgments affirmed.  All the Justices concur.*