317 Ga. 799
FINAL COPY

S23A0861. SCOTT v. THE STATE.

BOGGS, Chief Justice.

Appellant Milton Nathaniel Scott challenges his convictions for felony murder and other crimes in connection with the shooting death of Jerrica Porter. Appellant contends that the trial court erred in admitting into evidence one of his custodial statements in which he admitted to shooting Porter but claimed the shooting was an accident. He also contends that the trial court abused its discretion in overruling a hearsay objection to testimony that characterized his initial statement that Porter shot herself as implausible and that his trial counsel was constitutionally ineffective in failing to object to testimony and evidence that suggested Appellant was involved in a gang.[1]

---

[1] The crimes occurred on February 10, 2019. On May 9, 2019, a Greene County grand jury indicted Appellant for malice murder; felony murder based on aggravated assault; involuntary manslaughter; tampering with evidence; and cruelty to children in the third degree. At a trial from April 12 to 16, 2021,

Appellant's claims fail. Regardless of whether there was error in the admission of the custodial statement, the State introduced into evidence a recording of a jailhouse phone call in which Appellant repeated his claim that his shooting of Porter was an accident, and thus Appellant has failed to show harm from the admission of the statement. Additionally, because Appellant's defense was accident and because the admission of the hearsay testimony and the evidence to which trial counsel did not object was not relevant to that defense, these enumerations do not require reversal. Accordingly, we affirm.

1. The evidence presented at trial showed the following.[2]

the jury acquitted Appellant of malice murder and found him guilty of felony murder, tampering with evidence, and cruelty to children. After the jury returned its verdict, the trial court granted the State's pretrial motion to nolle pros the involuntary manslaughter count. The trial court sentenced Appellant to serve life in prison with the possibility of parole for felony murder and two consecutive terms of twelve months each for tampering and for cruelty to children. Appellant filed a timely motion for new trial, which he amended with new counsel on July 20, 2022. After an evidentiary hearing on August 15, 2022, the trial court entered an order denying the motion on February 16, 2023. Appellant filed a timely notice of appeal, and the case was docketed in this Court to the August 2023 term and submitted for a decision on the briefs.

[2] Because of the harmless error analysis undertaken in Divisions 2 and 3, we set out the evidence in detail and "weigh the evidence as we would expect

Appellant and Porter started dating in 2018. On the morning of February 10, 2019, Appellant, Porter, and Porter's five-year-old son J. P. were at Porter's home. Porter spoke on the phone with a friend at 10:32 a.m. and asked her friend to come over later that day. Shortly thereafter, Appellant fatally shot Porter in her bedroom. After shooting Porter, Appellant ran to his mother's home, which was about 180 feet away, borrowed a cell phone, and ran back to Porter's home, where he saw J. P. standing over Porter. At 10:45 a.m., Appellant called 911 and told the operator that his girlfriend had been playing with a gun and accidentally shot herself in the chest. Appellant repeated that explanation to Officer Michael Greeson, a Union Point police officer, who was the first officer to arrive in response to the 911 call. Officer Greeson saw Porter lying face down in the bedroom and a nine-millimeter semiautomatic handgun on the floor near her. Officer Greeson cleared one unspent

reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Moore v. State*, 315 Ga. 263, 264 n.2 (882 SE2d 227) (2022) (cleaned up).

.

round from the gun's chamber and collected the gun as evidence.

Appellant also told a medical first responder and Deputy Robert McCannon, Sr., an officer with the Greene County Sheriff's office, that Porter had shot herself. Video footage from Deputy McCannon's body camera showed Appellant making several statements about the incident. Appellant said that Porter was playing with his gun and waving it around; that he told her to stop; that she then turned it toward the wall and asked if it would shoot; then she turned it toward herself and asked if it would shoot; and then she pulled the trigger. He also said that he and Porter often played with the gun; that they were watching television that morning when she picked up the gun; and that he told her it was loaded. During the interview, Appellant demonstrated how Porter shot herself by holding his arms straight out in front of him as if he had a gun pointed toward his chest and pulled the trigger using his thumbs.

Appellant was subsequently interviewed by GBI Agent Niki Simmons. Portions of the video-recordings of two interviews and an

4

audio-recording of a third interview were played at trial. During the first interview, which took place the day of the shooting, Appellant repeated the same story and gave the same demonstration that he had provided to Deputy McCannon. However, he also suggested that on the day of the shooting, Porter was upset about not being hired for a job she wanted and stated that he and Porter had previously play-acted killing themselves with the gun. He also stated that after Porter shot herself, he picked up the gun and wiped it off with his shirt because he was scared and he knew "how it gonna would look."

In the second interview, which occurred the following day and after Appellant had been arrested on a tampering-with-evidence charge based on his admission that he wiped off the gun, he repeated the story that Porter had been playing with the gun, held it out in front of her, and pulled the trigger with her thumb, shooting herself in the chest. However, he also said he tried to grab the gun as Porter was pointing it at herself, and, without touching the gun, he bumped her hand before the gun discharged.

About a week later, on February 18, 2019, Appellant was

questioned by Agent Simmons and GBI Special Agent Mike Maybin; this interview was audio-recorded only.[3] In this interview, Appellant told the agents that he took the gun from Porter after she had pointed it at herself; he began waving the gun around; he pointed it at her and pulled the trigger but did not know the gun was loaded. Agent Simmons testified that during this statement, Appellant demonstrated pointing the gun at Porter from a distance of about five feet. At the conclusion of the interview, Appellant asked the agents if, "in the courtroom, could y'all please make it look like I did not just straight up shoot her or nothing like that — it was a straight accident."

Porter's parents and several friends and neighbors testified about Porter's psychological state, including in the days leading up to the shooting. According to the testimony of these witnesses, Porter was excited about starting a new job with the United States Postal Service and being able to return to college to complete her

_____

[3] Appellant's contention that the trial court erred in admitting this statement is addressed in Division 2.

degree and that she gave no indication of being suicidal. Other witnesses testified about the relationship between Appellant and Porter. According to several witnesses, Appellant and Porter argued occasionally and Appellant punched holes in the walls of Porter's home during these arguments. One of Porter's close friends testified that on more than one occasion, she heard Appellant tell Porter he would kill her and then laugh and say he was only joking. However, one friend testified that Appellant and Porter seemed like a happy couple. The State also introduced into evidence an undated note found in Porter's car, in which Appellant wrote that he was leaving Porter and moving to Athens; that he loved her but could not remain with her; that he was sorry "for what I did to you"; and that he could not understand why she had made posts on Facebook that were hurtful to him.

J. P., who was seven years old at the time of trial, testified as follows. Appellant and Porter argued sometimes, and on the morning of the shooting, Appellant was "mad"; Appellant left the home and returned with "a gun in his pocket" and entered Porter's

bedroom; Appellant and Porter began arguing; Appellant said he "was tired of this"; and Appellant "was mad and he shot my mom." J. P. explained that after he heard a gunshot and the sound of the door being opened, he saw Porter and a gun on the floor, and he began to shake her, but she did not wake up. Appellant told him to go to his room and said, "[I]f anybody [asks] you where you was, you tell them you were outside." Appellant then left the room but came back in with a cell phone and called the police.

A forensic interviewer who conducted a video-taped interview with J. P. about a week after the shooting testified that children J. P.'s age are not able to tell a story chronologically, and when interviewing J. P., she was not always able to tell whether he was talking about one event or more than one event. During the interview, which was played for the jury, J. P. said his mother was dead, and in response to the interviewer's request to say more about that, he said that Porter was playing with a gun, but he also repeatedly said that Appellant was holding the gun or that Appellant fired the gun. After the shooting, Appellant went outside

8

to get a phone and called police. After Appellant called the police, J. P. went outside with Appellant; Appellant told another man who had come over that Porter "had blasted herself." J. P. told the interviewer he thought his "Momma blasted her own self" and that happened because she was arguing with Appellant about Appellant leaving and Porter not wanting him to go. J. P. described being in various places in the home when the shooting occurred, including under the bed in Porter's room, outside Porter's room, and in his own room.

The medical examiner who performed Porter's autopsy determined that Porter died as a result of a single gunshot wound to the torso; that the bullet moved in a downward direction at a 45-degree angle and from left to right, not "straight"; that Porter was likely leaning forward when she was shot; and that based on the presence of stippling and the absence of soot around the wound, the gun was approximately two to four feet away from Porter when it was fired.

A GBI firearms examiner determined that, based on his

analysis of the shirt Porter was wearing, the bullet hit Porter at an angle rather than straight on, and that the muzzle of the gun was approximately two feet from Porter when it was fired. Additionally, the nine-millimeter gun collected as evidence from the scene[4] would not discharge if dropped; a person would have to pull the trigger in order for the gun to discharge; and it would take at least four-and-a-half pounds of pressure to fire the gun.

The State introduced into evidence a recording of a phone call that Appellant made from jail to his mother during the trial. In that call, Appellant told his mother that he did shoot Porter, but it was an accident.[5] He further explained that Porter had been playing with the gun; he took the gun from her so she would stop playing with it; he then started playing with it; and the gun "went off." He also told his mother that when he gave his first statements to law enforcement, he was "traumatized" and could not "get it that she

---

[4] The firearms examiner testified that he was unable to determine if the fatal bullet was fired from the gun found at the scene.

[5] In opening statements, Appellant's trial counsel told the jury that Appellant "doesn't deny having the gun" and that the shooting was "a tragic, tragic accident."

was gone because of me."

At trial, Appellant testified that he and Porter argued occasionally and that he sometimes punched holes in the walls during their arguments but that he never hit Porter. He acknowledged that about three to four weeks before Porter's death, he wrote the note that was found in her car, but he testified he never actually left her, and their relationship continued. According to Appellant, he had purchased the gun from Porter about one month before for $20. On the morning of the shooting, Porter started playing with the gun; he told her to stop playing with it; and he told her it was loaded. He continued:

> But the only reason why I really said that, was because I didn't want to play with the gun that morning. So, I'm figuring she — if I told her there's one in the head, she'll put it down. So, I went to go get the gun from her. So, out of nowhere, I started playing with the gun, too. And I was waiving [sic] it around. And I was, like, if somebody kick your door and they tell you; get on the ground, get your ass on the ground. What would you do? And she was, like,
> ["]I ain't — I ain't gonna run.["] I mean, I'm gonna run. I was, like, so if you tell me somebody come in here and tell you; get your ass on the ground — pow, then the gun go off. And then when the gun goes off, like, everything

happened so fast. Like, I knew the gun go went off, but I didn't know it hit her. But, so I'm thinking she was playing when she grabbed her chest[.]

He further testified that he did not keep the gun loaded and believed the gun was unloaded at the time of the shooting and had the safety on. Appellant also testified that he "hang[s] around gang members" but is not in a gang.

2.    Appellant contends that the trial court erred in admitting his February 18 statement in which he admitted to firing the fatal shot but claimed he did so accidentally.[6] He asserts that the agents continued to interrogate him after he had invoked his right not to speak with the agents and that the statement was obtained in violation of his right to remain silent under the Fifth Amendment to the United States Constitution.[7]

We have repeatedly made "clear that, when a person in the

---

[6] Appellant does not challenge the admission of his other statements to Agent Simmons or the recording of his jailhouse call to his mother.

[7] In a pretrial ruling denying Appellant's motion to suppress his February 18 statement, the trial court ruled that Appellant did not make a clear or unequivocal invocation of his right to remain silent. In its order denying the motion for new trial, the trial court relied on a different rationale, ruling that Appellant invoked his right to remain silent but reinitiated the interview such that his statements were admissible.

custody of law enforcement officers unambiguously and unequivocally invokes his right to remain silent in connection with their interrogation, the interrogation must cease immediately." *Ensslin v. State*, 308 Ga. 462, 470 (841 SE2d 676) (2020) (cleaned up); *Mack v. State*, 296 Ga. 239, 242 (765 SE2d 896) (2014) ("[W]hen an individual in custody 'indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" (quoting *Miranda v. Arizona*, 384 U.S. 436, 473-474 (86 SCt 1602, 16 LE2d 694) (1966)). "Interrogation" means express questioning as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Brown*, 287 Ga. 473, 476-477 (697 SE2d 192) (2010) (cleaned up). If, after officers scrupulously honor a suspect's invocation of his right to silence, the suspect initiates further conversation with law enforcement officers, the latter statement is admissible. See *Mack*, 296 Ga. at 244. However, "a suspect will be considered to have 'initiated' renewed

13

contact with law enforcement authorities, so as to permit further interrogation, only if the renewed contact by the suspect was not the product of past police interrogation conducted in violation of the suspect's previously-invoked rights." Id. at 248.

A trial court commits an error of constitutional magnitude when it admits into evidence over the defendant's objection a statement taken in violation of his right to silence. See *Ensslin*, 308 Ga. at 470. But the error in the admission of such a statement may be deemed harmless "if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly admitted evidence." Id. at 471 (cleaned up). See also *Taylor v. State*, 312 Ga. 1, 10-11 (860 SE2d 470) (2021) (presumed erroneous admission of statement taken after invocation of defendant's right to counsel was harmless beyond a reasonable doubt where statement was cumulative of statements made after defendant had been advised of *Miranda* rights and had not invoked right to counsel).

With these principles in mind, we turn to the relevant facts of

Appellant's February 18 interview with Agents Simmons and Maybin. At the beginning of the interview, Appellant said he did not want to talk to the agents again. After Agent Maybin advised Appellant of his *Miranda* rights and asked Appellant if he was willing to speak with the agents, Appellant again said, "No." Agent Maybin acknowledged that it was Appellant's right not to talk to them; Agent Simmons told Appellant that she would "document that you refused to talk today"; and Agent Simmons wrote "refused" on the waiver of rights form. Thereafter, the agents continued to speak to Appellant for several minutes, with Agent Simmons repeatedly telling Appellant that she knew he was lying and Agent Maybin telling Appellant that "we're trying to help you help yourself" and that unless he told the truth "all these people in this community are gonna think you're a coldblooded damn killer." Ultimately, Appellant agreed to talk to the agents and signed a written waiver of his rights and provided the statement detailed above.

Assuming without deciding that the agents violated Appellant's constitutional rights by continuing to speak to him after

he had invoked his right to silence and that Appellant did not reinitiate the conversation, we conclude that any error in the admission of the statement was harmless beyond a reasonable doubt. Although Appellant asserts that the admission of the statement was harmful because the February 18 statement was the first one in which he admitted he was holding the gun and pulled the trigger, he does not explain *how* the fact that the February 18 statement was the first time he admitted holding the gun renders the admission of the statement prejudicial beyond a reasonable doubt.

As detailed above, the February 18 statement was consistent with the admissions Appellant made in the phone call to his mother. In the February 18 statement, Appellant admitted that he was holding the gun when it discharged but claimed it was an accident. In the jailhouse call to his mother, the recording of which was admitted into evidence without objection, he also admitted that he shot Porter but claimed that his firing of the gun was accidental. The statements were consistent with one another, were not

inconsistent in any material respect, and were consistent with Appellant's defense at trial. Moreover, the properly admitted evidence of Appellant's guilt, as described in Division 1, was very strong, and there was no forensic evidence or other witnesses' testimony supporting Appellant's defense of accident. Thus, we conclude that the admission of the February 18 statement was harmless beyond a reasonable doubt. See *Ensslin*, 308 Ga. at 472; *Frazier v. State*, 278 Ga. 297, 298 (602 SE2d 588) (2004) (holding that even if there was constitutional error in admission of custodial statement, admission was harmless beyond a reasonable doubt where custodial statement merely repeated non-custodial admissions to first officer on the scene). Accordingly, the admission of the February 18 statement does not require reversal.

3. Appellant also contends the trial court abused its discretion in allowing GBI Special Agent Skylar Reese to testify, over a hearsay objection, to a statement made by the medical examiner during the autopsy. Agent Reese was present when the autopsy was conducted, and when he explained to the medical

examiner that Appellant had said Porter shot herself with her arms held straight out, the medical examiner responded, "[I]t couldn't have happened that way." Assuming without deciding that the trial court abused its discretion in admitting the medical examiner's statement through Agent Reese, any error was harmless. A non-constitutional error is harmless if "it is highly probable that the error did not contribute to the verdict." *Anglin v. State*, 302 Ga. 333, 341 (806 SE2d 573) (2017). Here, Agent Reese's recounting of the medical examiner's comment was cumulative of direct testimony from the medical examiner and the firearms examiner that contradicted Appellant's assertion in his initial statements that Porter had shot herself by holding the gun with her arms straight out and pointed directly at her chest. Specifically, both the medical examiner and the firearm examiner testified that the gun was pointed at an angle when it discharged. That meant that Porter could not have held the gun "straight out," as Appellant originally told law enforcement — which was the crux of the medical examiner's statement during the autopsy. Accordingly, there was no

18

harm from Agent Reese's testimony.[8] See *Anglin,* 302 Ga. at 336 (holding that "erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced"). Moreover, Appellant's defense at trial was that he shot Porter accidentally, not that Porter shot herself. So the medical examiner's statement that the shooting "couldn't have happened" in the manner Appellant initially claimed was not inconsistent with that defense. See *Allen v. State*, 259 Ga. 303, 304 (379 SE2d 513) (1989) (holding that improper admission of hearsay testimony was harmless where it was not inconsistent with the defense's theory of justification).[9] Accordingly, this enumeration of error is without merit.

4. Finally, Appellant contends that his trial counsel was constitutionally ineffective for failing to object to evidence and

---

[8] Appellant makes no argument that the admission of Agent Reese's testimony was prejudicial because it caused him to alter his defense.

[9] Although *Allen* was decided under the old Evidence Code, and this case was tried under the new Evidence Code, the harmless error doctrine applicable remains the same. See *Smith v. State*, 299 Ga. 424, 431-432 (788 SE2d 433) (2016).

testimony that potentially raised an inference that Appellant was a member of a gang. To establish that his trial counsel was constitutionally ineffective, Appellant must prove both deficient performance by his counsel and resulting prejudice. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that his attorney's acts or omissions were "objectively unreasonable . . . considering all the circumstances and in the light of prevailing professional norms." *Davis v. State*, 299 Ga. 180, 182-183 (787 SE2d 221) (2016). To establish the required prejudice, Appellant must show that but for his attorney's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. See id. at 183. However, an appellate court "need not address both components of the inquiry if the defendant makes an insufficient showing on one." Id. (cleaned up).

Appellant asserts trial counsel should have objected to portions of Agent Reese's testimony and to documents from Appellant's Facebook account admitted into evidence during that testimony.

The documents from Appellant's Facebook account showed that Appellant's "screen name" was "SlimeBall Scott" and contained comments posted by two individuals, Jalyric Wright and "Hothead Ru." The comments from these individuals included a statement that one of them needed a "poxket monster," to which Appellant responded "I ain't got nun [b]ut one." In a similar comment, one of the individuals said he heard that Appellant had a "lil 9" and asked if Appellant was looking to get rid of it, to which Appellant responded he was going to keep it. Agent Reese testified that the references to a "poxket monster" and "lil 9" referred to a pistol and a nine-millimeter caliber firearm, respectively, and that certain terminology used by the other individuals in the Facebook posts referred to a "blood subset."

Trial counsel testified at the motion for new trial hearing that he did not believe that the comments by the other individuals on Appellant's Facebook page "had anything to do with any of the facts concerning this case," that the gang references were not made by Appellant, and that there was no other evidence that Appellant was

21

in a gang.

Assuming without deciding that trial counsel was deficient, we agree with the trial court that Appellant failed to establish prejudice. The Facebook posts and testimony about Appellant owning a gun are cumulative of Appellant's testimony that he owned the nine-millimeter gun. And, as noted above, Appellant's defense was accident, and the brief references in Agent Reese's testimony and the Facebook posts to gang-related terminology had a tenuous-at-best connection to proving or disproving the shooting was accidental. Additionally, Appellant admitted in his testimony that he knew gang members, and the prosecutor made no reference in the opening or closing argument to Appellant's alleged gang affiliation. Accordingly, Appellant has failed to meet his burden of establishing prejudice. See *Turner v. State*, 308 Ga. 537, 541 (842 SE2d 40) (2020) (determining that appellant failed to show prejudice stemming from counsel's failure to ensure that reference to defendant's membership in a gang was redacted from letter admitted into evidence where there was no evidence that the crime

was gang-related, the State's theory of the case did not relate to gang activity, and the prosecutor did not rely on gang activity in arguments to the jury). For these reasons, Appellant's claims of ineffective assistance of trial counsel are without merit.[10]

*Judgment affirmed. All the Justices concur.*

---

[10] In our analysis, we have assumed two trial court errors of an evidentiary nature and determined that each error was harmless. And we have assumed deficient performance by trial counsel but determined that Appellant failed to demonstrate prejudice. Appellant has made no argument that we should conduct a cumulative error review. See *State v. Lane*, 308 Ga. 10, 18 (838 SE2d 808) (2020) ("a defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors"). Nevertheless, we conclude that Appellant has failed to establish that the combined prejudicial effect of these assumed trial court errors and assumed deficient performance of trial counsel denied him a fundamentally fair trial. See, e.g., *Huff v. State*, 315 Ga. 558, 568 (883 SE2d 773) (2023) (rejecting cumulative error claim "because Appellant has not demonstrated that the prejudicial effect of the assumed trial court errors and ineffective assistance denied him a fundamentally fair trial").

Decided December 19, 2023.

Murder. Greene Superior Court. Before Judge Massey.

*David J. Walker*, for appellant.

*T. Wright Barksdale III, District Attorney, Allison T. Mauldin, Jeff P. Burks, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Emily R. Polk, Assistant Attorney General*, for appellee.