321 Ga. 390
FINAL COPY

S25A0398. WILLIAMS v. THE STATE.

PETERSON, Chief Justice.

Michael Williams is appealing his convictions for malice murder and other offenses for the fatal shooting of Tomas Gooden at a house party.[1] Williams asserts (1) plain error in the trial court's failure to instruct the jury that the State bore the burden to disprove Williams's justification defense and (2) ineffective assistance of

---

[1] Gooden was shot on the night of December 8, 2017. On March 5, 2018, a Coweta County grand jury returned an indictment charging Williams with malice murder, felony murder predicated on possession of a firearm by a convicted felon, aggravated assault (of Armon Tucker), possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. Tried by a jury from January 28 to February 5, 2019, Williams was found guilty of all counts. On February 5, 2019, the trial court sentenced Williams to life in prison for malice murder, 20 years concurrent for aggravated assault, five years concurrent for possession of a firearm by a convicted felon, and five years consecutive for possession of a firearm during the commission of a felony. The felony murder count was vacated by operation of law. Williams filed a timely motion for new trial, which was amended by appellate counsel on September 19, 2023. Following a hearing, the trial court denied the motion in an order entered on January 25, 2024. The order denying the motion for new trial was vacated on Williams's motion on March 1, 2024, and reentered on June 20, 2024. Williams filed a timely notice of appeal, and the case was docketed to this Court's term beginning in December 2024 and submitted for a decision on the briefs. Williams specifies that he is not appealing his conviction for possession of a firearm by a convicted felon.

counsel in failing to investigate and introduce evidence of Gooden's reputation for violence. Because we conclude that Williams has not met his burden to show that the omission in the jury charge or the alleged deficient performance of counsel affected the outcome of the case, we affirm.

The evidence presented at trial may be summarized as follows.[2] On the night of December 8, 2017, Williams and Gooden were at a house party in Coweta County. At the party, Williams, Gooden and others played a gambling game in the garage. After Williams and Gooden argued over the pot of money and Gooden pushed Williams to the floor of the garage, Williams fired a gun once at Gooden, fatally striking him in the head. Williams then fled outside. Police later encountered Williams walking along the side of the road on the morning after the shooting.

Responding police found Gooden's dead body in a corner of the

---

[2] Because Williams does not challenge the sufficiency of the evidence as to his convictions, and because we evaluate a claim of plain trial court error in the light of the overall strength of the State's case, we do not present this in the light most favorable to the verdicts.

2

garage, near the garage door. Blood reached from the floor to about 30 inches up the wall of the garage. The medical examiner opined that a bullet traveled through Gooden's head in a downward trajectory, from the top, right, front part of Gooden's head to the left, bottom, back side of his head. Gooden was at least eight inches taller than Williams. The medical examiner said that the chances that the bullet had ricocheted off another surface before hitting Gooden were "minimal to none," and Williams testified that he did not notice the bullet ricochet off anything. Gooden would have died almost instantly and would not have been able to take additional steps after being shot, the medical examiner testified. The medical examiner testified that Gooden probably left the blood on the garage wall when he collapsed and hit his head against it. A spent shell casing was found on the floor of the garage, near the doorway leading to the kitchen, approximately 12 feet from the corner of the garage where Gooden's body was found. A firearms examiner was able to determine that the casing was ejected from a firearm found in a well where Williams said he had hidden it.

Williams had gone to the party with Darius Martin and Xavier Phillips. Martin testified that Gooden was winning at the gambling game, and Williams was losing, and Gooden twice had tried to pick up money over Williams's protests. Martin testified that, after Gooden pushed Williams to the ground, Martin and Phillips tried to help Williams up, but Williams "got up quick" and "with the gun in hand." Martin testified that once Williams stood up, Gooden was "[b]acking off of him" toward a corner of the garage. Martin testified that he saw Gooden reaching for the waistband of his pants as Williams was standing up but did not see Gooden with a gun. Martin testified that he heard a gunshot "immediately" after Williams stood up. At that time, Martin said, Gooden's "back was in the corner" of the garage, and Williams was standing right in front of the doorway out of the garage, about 12 feet away. On cross-examination, Martin agreed that after Williams was pushed down, people were "moving towards him" but suggested those were people "trying to help him up."

Phillips also testified, recalling that Williams pulled out his

4

firearm as he was getting off the ground after Gooden pushed him. Phillips testified that Williams was standing near the door into the house at the time. Phillips said he did not see a firearm in Gooden's possession. Phillips testified that Williams had appeared afraid of Gooden after an incident earlier in the evening when Gooden "got loud with" Williams. Later, during the argument that led to Gooden pushing Williams, Phillips testified, Gooden threatened to beat up Williams. Phillips said Williams looked afraid when he got up with his gun. Phillips testified that, in the times that he had seen Williams and Gooden around one another before the night of the shooting, he had never seen them have problems with one another, and that Williams had not appeared scared of Gooden when they had seen one another at another house party a month prior.

Gooden's friend, Armon Tucker, testified that Gooden did not have a gun that night. Tucker testified that he dove to the ground when a gun was pointed at him. Tucker was an uncooperative witness, saying multiple times that he wanted to "plead the Fifth," and never testified directly that Williams was the one who pointed

a gun at him. But Tucker appeared to address Williams at the end of his testimony, saying, "Basically, . . . all this man did was push this man. And this man got killed. . . . Your life . . . wasn't in danger . . . or none of that, man. You done killed my brother, man." Tucker indicated that he was standing near Gooden in a corner of the garage, while Williams was standing near a door leading to the kitchen.

In a statement to officers, a recording of which was played for the jury, Williams repeatedly denied shooting Gooden or knowing who did. About 85 minutes into the interview, Williams acknowledged that he shot Gooden after he was pushed, saying, "That's, like, self-defense." Williams acknowledged that he had pulled his gun while Gooden was pushing him.

Testifying in his own defense at trial, Williams said that he had accused Gooden of "cheating" while gambling. Williams testified that Gooden had "snatched" $20 of Williams's money from the floor, at which point Williams decided to quit the game rather than "start something" over $20, given that Gooden was bigger than Williams

and Williams was in someone else's house. Williams said that, while Williams was counting his money and preparing to leave, Gooden called him a "p***y n****r" before "snatch[ing]" additional money out of Williams's hand. Williams testified that he was afraid for his life when Gooden pushed him across the garage, because Gooden had four other gang members around him who were moving toward him, so Williams anticipated that he was about to be the victim of a five-on-one beating. Williams said he had seen Gooden "fixing his pants" earlier in the evening and thought Gooden might be reaching for a gun when Williams shot Gooden, while acknowledging he had not seen Gooden with a gun. Asked specifically why he shot Gooden, Williams responded, "Because I was scared for my life[,]" although on cross-examination Williams indicated that he said in his police interview that he shot Gooden "[b]ecause he snatched my money and then pushed me down." Williams testified that he aimed for Gooden's shoulder and was shooting upward from the ground toward the ceiling, standing about five feet away from Gooden. Williams denied that Gooden was in the corner of the garage when

he was shot.

1. Williams argues that the trial court plainly erred in failing to instruct the jury that the State was required to disprove Williams's justification defense beyond a reasonable doubt. We conclude that although the trial court erred in omitting this language from the instruction, Williams has not met his burden to show plain error.

The trial court instructed the jury generally on justification, the State's burden of proof, and the presumption of innocence, including that "[t]here is no burden of proof upon the defendant whatsoever and the burden never shifts to the defendant to introduce evidence or to prove innocence." But the court's instruction did not specify that it was the State's burden to disprove justification beyond a reasonable doubt. Williams's trial counsel did not object to this omission prior to the jury beginning deliberations. Therefore, as Williams acknowledges, his claim may be reviewed on appeal only for "plain error." OCGA § 17-8-58 (b). See also *State v. Kelly*, 290 Ga. 29, 31-32 (1) (718 SE2d 232) (2011) (establishing

8

plain-error review for unpreserved jury instruction claims). This Court applies the following test for determining whether there is plain error in jury instructions under OCGA § 17-8-58 (b):

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Kelly*, 290 Ga. at 33 (2) (a) (citation and punctuation omitted; emphasis in original). If one prong of the plain error test is not satisfied, we need not address the other prongs of the test. See id. at 34 (2) (b) n.5. Satisfying this high standard "is difficult, as it should be." Id. at 33 (2) (a) (citation and punctuation omitted).

Here, the State does not contest that the first two prongs of the plain-error test are satisfied here. Indeed, we have held that it is a clear and obvious error to omit the sort of language at issue here.

9

See *State v. Alvarez*, 299 Ga. 213, 215 (1) (790 SE2d 66) (2016). But Williams has not met his burden to show that the error affected his substantial rights.

Most significantly, the prosecutor specifically told the jury that the State bore the burden to prove that Williams "intended to kill [Gooden], it was unlawful, meaning it was without justification." This affirmative statement by the prosecutor acknowledging to the jury that the State bore the burden to disprove justification lessened the possibility that the omission of the State's specific burden on justification from the jury charge affected the outcome of the trial.

Additionally, Williams's justification defense was weak. The trial court presented the jury with a few different bases for justification, instructing the jury that a person is justified in using deadly force "if that person reasonably believes that such force is necessary to prevent death or great bodily injury to himself" or "to prevent the commission of a forcible felony[,]" including specifically robbery by sudden snatching or aggravated assault. Regarding the defense of justification to prevent a forcible felony, Williams testified

that Gooden had "snatched" Williams's money, and defense counsel argued in closing that Williams acted to prevent the crime of robbery by sudden snatching. But it is highly unlikely that, had the trial court properly instructed the jury about the State's burden to disprove justification, the jury would have acquitted Williams on the theory that the shooting was justified to prevent the commission of the forcible felony of robbery by sudden snatching, given that Williams specifically testified that he shot Gooden because he was in fear for his life. Cf. *Holmes v. State*, 273 Ga. 644, 647 (4) (543 SE2d 688) (2001) (rejecting argument that trial court erred in failing to give unrequested charge on prevention of robbery by sudden snatching as part of justification instructions, where the defendant testified that he would not have fired the fatal shots if the victim had not drawn a gun, such that "the prevention of robbery . . . by sudden snatching was not reasonably raised by the evidence" (citation and punctuation omitted)).

As for theories that Williams shot Gooden to prevent an aggravated assault or otherwise prevent his own death or great

11

bodily injury, very little evidence supported Williams's justification defense beyond his own self-serving testimony and evidence supporting his general belief that Gooden had a violent character. Although Martin testified that he had seen Gooden reaching for his waistband just before he was shot, and Phillips testified that Gooden had threatened to beat up Williams, both Martin and Phillips testified that they did not see Gooden with a gun. Williams's self-defense claim was undermined by internal inconsistencies; Williams maintained for a significant portion of his police interview that he did not shoot Gooden and did not know who did, but later stated in the interview that he shot Gooden merely because he had been pushed, without claiming that he was afraid or thought Williams had a gun. The physical evidence also did not support Williams's claim that he shot Gooden from the ground and that Gooden was not in the corner of the garage, as the evidence showed that Gooden was found in the corner of the garage, he would not have been able to move once shot, the bullet moved in a downward trajectory, he was taller than Williams, and the bullet did not ricochet. Additionally,

Williams's flight from the scene of the crime and attempt to hide the murder weapon can themselves be evidence of guilt. See *Martin v. State*, 306 Ga. 538, 539 (1), 541-542 (2) (832 SE2d 402) (2019) (citing evidence of consciousness of guilt, which included attempts to destroy evidence of the shooting, in evaluating strength of evidence in case where the defendant claimed self-defense for purposes of harmless-error review); *Rowland v. State*, 306 Ga. 59, 65 (3) n.4 (829 SE2d 81) (2019) ("The fact that a suspect flees the scene of a crime points to the question of guilt in a circumstantial manner." (citation and punctuation omitted)). Given these considerations, Williams has failed to carry his burden to show that the omission from the charge to the jury affected the outcome of his trial, and his claim of plain error fails.[3]

---

[3] Williams relies on *Alvarez*, in which we concluded that the trial court plainly erred in failing to give the instruction at issue here. But in *Alvarez* we said that the trial court's instructional error "was all the more harmful" because the State in closing argument referenced the absence of a key witness at trial and implied that the defendant had a duty to present this testimony if it would have supported the justification defense. 299 Ga. at 215 (1). Here, although the prosecutor in closing argument generally referenced that Williams was claiming that Gooden was "coming after him" "with no other support of any other evidence," the prosecutor did not imply that the defendant

2. Williams also argues that his trial counsel was ineffective because she failed to investigate and introduce evidence about Gooden's character. We conclude that Williams has not shown that he was prejudiced by any deficient performance.

At trial, the jury heard evidence that Williams and Gooden were each associated with a different street gang.[4] During the recording of Williams's interview by police, an officer is heard describing Gooden as "a very well-known Blood." Additionally, the defense introduced various evidence about Gooden's prior gang and criminal activity. Williams testified that he knew that Gooden was a member of the Bloods gang and had heard Gooden brag about violent acts. Williams said he was aware of Gooden's prior involvement in violence and gang activity, including seeing in a newspaper that Gooden had been convicted of "[g]ang charges and shooting" and hearing from a fellow jail inmate that the inmate had

should have presented any particular evidence. Rather, as noted above, the prosecutor specifically told the jury that the State bore the burden to disprove justification.

[4] The State's gang expert testified that he did not believe that the shooting was carried out to further the interests of Williams's gang.

14

been sent by Gooden to rob a woman, resulting in the woman being shot. During Williams's testimony, the trial court admitted redacted certified copies of several of Gooden's convictions under the Georgia Street Gang Terrorism and Prevention Act (OCGA § 16-15-1 et seq.). The defense also introduced and the trial court admitted several social media posts by Gooden that Williams testified influenced his decision to shoot Gooden; the posts showed Gooden describing himself as "loyal" and "a [b]oss," bragging about gang activity, and deriding police; and they showed pictures of Gooden, including in prison, displaying cash, and making a hand signal that Williams said was a Blood gang sign.

Notwithstanding the admission of this evidence at trial, Williams in his motion for new trial raised a claim that his trial counsel was ineffective for failing to investigate and introduce evidence of Gooden's violent character. In support, Williams offered testimony from a private investigator who had discussed with trial counsel the possibility of working on the case but had not been hired to do so; the investigator happened to be familiar with Gooden

through their personal interactions related to court cases and through other community ties. The investigator testified at the motion-for-new-trial hearing that Gooden "was known to have violent tendencies" and had "a reputation of violence" in the community. Trial counsel testified at the motion-for-new-trial hearing that she did not have adequate time to prepare for trial and that, had she secured more time, she would have "looked into hiring an investigator" to look into Gooden's character, and she "[a]bsolutely" would have introduced admissible evidence of Gooden's character had it been available. The trial court rejected the ineffectiveness claim on the basis that "[a]ny testimony from [the investigator] about the victim's character would have been inadmissible (only Defendant's knowledge of the victim's character being relevant) or merely cumulative."

To prove a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d

16

674) (1984). "If [a defendant] fails to establish one of these two prongs, we need not examine the other." *Payne v. State*, 314 Ga. 322, 328 (3) (877 SE2d 202) (2022) (citation and punctuation omitted). "To show deficient performance, the defendant must demonstrate that counsel performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms." Id. at 328-329 (3). "To establish prejudice, [a defendant] must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. at 329 (3) (citation and punctuation omitted). "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." Id. at 329 (3) (citation and punctuation omitted). In particular, when evaluating whether a defendant has established prejudice, we "weigh the evidence as we would expect reasonable jurors to have done rather than in the light most favorable to the verdict." *Harmon v. State*, 319 Ga. 259, 265 (3) (903

17

SE2d 28) (2024) (citations and punctuation omitted).

Here, even assuming deficient performance in counsel's failure to investigate Gooden's character further or present the testimony about his reputation in the community, Williams has not shown a reasonable probability of a different result had that testimony been presented. A variety of evidence about Gooden's character — including his membership in a gang, bravado about gang activities, Williams's understanding that Gooden had been convicted of "gang charges and shooting," documentary evidence of convictions for gang charges, and evidence that Gooden had been in prison — was admitted at trial. Williams testified about his personal knowledge of criminal activity by Gooden, and an officer was heard on the recording of Williams's interview that Gooden was a well-known gang member. Taken together, this evidence about Gooden that Williams was permitted to introduce at trial reasonably supported an inference that Gooden had a reputation for violence. And there is not a reasonable probability that the outcome of the trial would have been different had counsel introduced at trial the investigator's

18

reputation and opinion testimony, given that the jury heard evidence of *particular* violent acts by Gooden. See *Mohamud v. State*, 297 Ga. 532, 535 (2) (b) (773 SE2d 755) (2015) (defendant not prejudiced by trial counsel's failure to call witnesses who would have testified to the victim's general reputation for violence in the community where jury heard evidence that the victim had violently assaulted the defendant in the past).[5] Thus, this claim fails.

*Judgment affirmed. Warren, PJ, and Bethel, Ellington, McMillian, LaGrua, Colvin, and Pinson, JJ, concur.*

---

[5] Williams argues in a footnote that the Court should consider whether the cumulative effect of the trial court's instructional error and counsel's alleged deficient performance would support reversal under *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020). We conclude that Williams has failed to establish that the combined prejudicial effect of the trial court's instructional error and the assumed deficient performance of trial counsel denied him a fundamentally fair trial. See *Scott v. State*, 317 Ga. 799, 808 (4) n.10 (896 SE2d 484) (2023).

Decided April 8, 2025.

Murder. Coweta Superior Court. Before Judge Palmer.

*The Bullard Firm, Brandon A. Bullard, Audra M. Murphey*, for appellant.

*John H. Cranford, Jr., District Attorney, Robert W. Mooradian, Laura K. Lukert, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.