NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 9, 2025

S26A0052.  DIXON v. THE STATE.

WARREN, Presiding Justice.

Appellant Brandi Dixon was convicted of felony murder in connection with the stabbing death of Ebony Smith.[1]  Dixon contends that the evidence presented at her trial was legally insufficient and that the trial court erred by denying her motion for a directed verdict of acquittal.  She also claims that her trial counsel provided constitutionally ineffective assistance and that the trial court abused its discretion by overruling her objection during the

---

[1] Smith was killed on July 15, 2018.  In October 2018, a Bibb County grand jury indicted Dixon for malice murder and felony murder based on aggravated assault.  At a trial from March 29 to 31, 2022, the jury found Dixon not guilty of malice murder and guilty of felony murder, and the trial court sentenced her to serve life in prison.  Dixon, through new counsel, filed a timely motion for new trial, which she later amended.  In June 2025, the trial court denied the motion. Dixon filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2025 and submitted for a decision on the briefs.

State's redirect examination of a witness and by failing to strike certain testimony. As explained below, we affirm.

1. Viewed in the light most favorable to the verdict, the evidence presented at Dixon's trial showed the following. In 2017 and 2018, both Smith and Dixon were dating George Duehart, who was known as "Little Man"; Duehart testified that neither woman knew about the other's relationship with him. In the fall of 2017, however, Smith and her sister encountered Dixon at a ballfield and noticed that Dixon was "pointing" at them. And during the summer of 2018, Dixon came to Smith's house and asked Smith's son if "Little Man" was staying there. When the son said that he was not, Dixon left.

On July 15, 2018, Duehart hosted a party at a house in Macon, which Smith and Dixon both attended. A friend of Duehart's who was also at the party saw Dixon standing at the top of a hill near the house, while Smith and her friend Ashley Oliver were standing near the bottom of the hill. Dixon was "twirling [a] knife" and "loudly" and "aggressively" saying: "[W]here the f**k … Little Man at, b**ch

2

will think I'm done, they got me f**ked up, I'll kill me a b**ch tonight."

Oliver testified as follows. Although she did not see Dixon with a knife, she did see Dixon near the top of the hill and overheard a man say to Dixon, "[O]h, you're going to cut me?" Smith and Oliver then went to a store. When they returned, Dixon was near the area where Smith parked her car. Dixon approached them and said, "[A]re you here for Little Man[?]" and Smith responded, "[T]hat's my man." Two men then held Oliver back to prevent her from intervening while Dixon got "in [Smith's] face" and was being "aggressive." Smith told Dixon to "get out [of her] face." Smith then reached inside the open passenger-side window of her car and into the glove compartment, grabbed her pistol, loaded the pistol, and "fired in the air." Dixon said, "[O]h, so you're going to shoot me over an F'ing man" and then stabbed Smith in the chest with a large kitchen knife. Smith fell to the ground as Dixon fled. The men who were holding Oliver released her; Oliver tried to grab the pistol, but the men grabbed it first and removed the magazine. Oliver put the

pistol and the knife in Smith's car and called 911.

Footage from body cameras worn by responding investigators, which the State introduced into evidence, showed the following. Investigators found Smith, who had died, on the ground near her car. They interviewed Oliver, who was crying and very "distraught," at the scene. Oliver said that during the altercation, Dixon "kept saying she had a knife" and she "pulled a knife on [Smith] and [Smith] was defending herself and she shot [Dixon] and then [Dixon] stabbed [Smith]." Dixon was leaning against a nearby building; her forehead was bleeding; and she was crying, saying, "She just shot a gun at me." When emergency responders asked where she was hurt, she said she did not know. One of the responders described the wound on Dixon's forehead as "a nick," and an investigator mentioned that it seemed like a "minor cut."

Another investigator testified that he found a pistol and a kitchen knife in Smith's car, a shell casing near the car, and a magazine in the grass nearby. He also testified that there was a bullet defect above the passenger-side door of the car. The

investigator photographed Dixon's forehead injury, and the photos were admitted into evidence. The investigator opined that, based on his training and experience, the injury was a cut, not a bullet wound. The medical examiner who performed Smith's autopsy testified that Smith had a four-inch long, four-inch deep stab wound in her chest, which caused her death.

Dixon did not testify; her theory of defense was self-defense.

2. Dixon contends that the evidence presented at trial was not constitutionally sufficient to support her conviction for felony murder based on aggravated assault. She also argues that the trial court erred by denying her motion for a directed verdict of acquittal. These claims fail.

"The test established in *Jackson v. Virginia*, [443 US 307 (1979)], is the proper standard for evaluating the sufficiency of the evidence as a matter of constitutional due process and for evaluating whether the trial court erred by denying a defendant's motion for a directed verdict of acquittal." *Rooks v. State*, 317 Ga. 743, 750 (2023). Under that test, we view all of the evidence presented at

trial in the light most favorable to the verdict and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crime of which she was convicted. See id. at 751. "This limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." Id. (quotation marks omitted).

Dixon asserts that the evidence was not sufficient as a matter of constitutional due process because the State failed to disprove beyond a reasonable doubt her claim of self-defense. Arguing that Smith was the aggressor, Dixon points to Oliver's testimony that Smith fired her pistol before Dixon pulled out a knife. But the jury was authorized to disbelieve that testimony and to instead credit other evidence showing that Dixon did not act in self-defense. In this respect, the evidence, viewed in the light most favorable to the verdict, showed that in the months before the murder, Dixon initiated encounters with Smith and her family, which authorized the jury to infer that Dixon suspected that Smith was in a

6

relationship with Duehart. At Duehart's party, a witness saw Dixon "twirling" a large kitchen knife, asking where Duehart was, and threatening to "kill … a b**ch." And Oliver testified that Dixon later "aggressive[ly]" confronted Smith about Duehart and got "in [Smith's] face," while two men held Oliver back to prevent her from helping Smith. Although Oliver also testified that Smith then grabbed her pistol and "fired in the air" before Dixon pulled out her knife, Oliver told investigators at the scene that Dixon "pulled a knife on [Smith] and [Smith] was defending herself and she shot [Dixon] and then [Dixon] stabbed [Smith]." It was for the jury to assess Oliver's credibility (as it also assessed the credibility of other witnesses) and to resolve any conflicts in the evidence. See *Rooks*, 317 Ga. at 751. See also *Gibbs v. State*, 309 Ga. 562, 564 (2020) ("[Q]uestions about the existence of justification are for the jury to resolve, and the jury may reject any evidence in support of a justification defense and accept evidence that a [killing] was not done in self-defense." (quotation marks omitted)).

In sum, the evidence presented at trial and recounted above

was sufficient to authorize a rational jury to reject Dixon's claim of self-defense and to find her guilty beyond a reasonable doubt of felony murder based on aggravated assault, and the trial court did not err by denying her motion for a directed verdict. See OCGA § 16-3-21(b)(3) ("A person is not justified in using force [in self-defense] if he ... [w]as the aggressor."); *Gibbs*, 309 Ga. at 564 (holding that the evidence was sufficient to support the defendant's conviction for felony murder based on aggravated assault where he shot and killed the armed victim, despite conflicting evidence as to whether the defendant or the victim drew and fired his weapon first); *Carter v. State*, 310 Ga. 559, 562 (2020) (holding that even if the jury believed the defendant's assertion that the victim fired first, there was sufficient evidence for the jury to conclude that the defendant was the initial aggressor, such that he was not entitled to a finding of justification).

3. Dixon also argues that her trial counsel provided constitutionally ineffective assistance by advising her not to testify at trial. As explained below, Dixon has not met her burden of

8

establishing that trial counsel performed deficiently, so this claim fails.

To prevail on her ineffectiveness claim, Dixon must establish that trial counsel's performance was constitutionally deficient and that she suffered prejudice as a result. See *Strickland v. Washington*, 466 US 668, 687 (1984); *Woods v. State*, 322 Ga. 365, 367 (2025). To prove deficient performance, Dixon must show that counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Woods*, 322 Ga. at 367 (quotation marks omitted). See also *Strickland*, 466 US at 687–91. To "overcome the strong presumption that trial counsel's performance fell within a wide range of reasonable professional conduct," *Woods*, 322 Ga. at 367 (quotation marks omitted), Dixon must show that no reasonable lawyer would have done what her lawyer did, or would have failed to do what her lawyer did not, see *Warren v. State*, 314 Ga. 598, 602 (2022). "[C]ounsel's decisions about trial tactics and strategy in particular may not form the basis of an ineffectiveness claim unless

they were so patently unreasonable that no competent attorney would have followed such a course." Id. (quotation marks omitted). To prove prejudice, Dixon must establish a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 US at 694. We need not address both parts of the *Strickland* test if Dixon does not meet her burden of establishing one. See *Strickland*, 466 US at 697; *Woods*, 322 Ga. at 367.

Here, Dixon briefly testified at the motion for new trial hearing that about a week before trial, counsel "wanted [Dixon] to testify, and [she] was ready to testify"; during the trial, however, "he told [her] not to get on the stand"; and Dixon "wanted to tell [her] side." Dixon offered no testimony about the reasons why trial counsel advised her not to testify after the trial began, and she did not call counsel to testify at the hearing. Nor did Dixon testify as to what she would have said, had she decided to testify at trial.

"Whether to testify in one's own defense is a tactical choice to be made by the defendant after consultation with h[er] lawyer, and

trial counsel's advice to a defendant not to testify is a strategic decision." *Morgan v. State*, 321 Ga. 495, 504 (2025). In the absence of evidence showing that counsel's advice not to testify was patently unreasonable, we presume that such advice was reasonably strategic. See *Woods*, 322 Ga. at 369; *Newman v. State*, 309 Ga. 171, 176 (2020). Even assuming that the trial court credited Dixon's testimony that trial counsel advised her not to testify at trial, Dixon has presented no evidence showing that counsel's advice was so patently unreasonable that no competent lawyer would have given it. And we see nothing in the record indicating that such advice was unreasonable, under the circumstances of this case. Accordingly, Dixon has not overcome the presumption that trial counsel's advice fell within the range of reasonable professional conduct, so she has not established that counsel performed deficiently, and her claim of ineffective assistance of counsel fails. See *Woods*, 322 Ga. at 369 (holding that the appellant failed to show that trial counsel performed deficiently by allegedly advising him not to testify at trial because the record was "silent as to what advice, if any, counsel gave

11

[the appellant] on that topic"); *Newman*, 309 Ga. at 175–76 ("[B]ecause [the appellant] did not ask his trial counsel any questions at the motion for new trial hearing about the reasons why [the appellant] decided to testify, we presume that any reason relating to trial counsel's advice to [the appellant] about testifying was strategic and would not amount to ineffective assistance.").[2]

4. Dixon asserts that the trial court abused its discretion by overruling her objection to testimony from Smith's sister during the State's redirect examination of her. We conclude that any such error was harmless.

By way of background, the prosecutor elicited the sister's

---

[2] Dixon does not appear to contend that she was not adequately informed of her right to testify. But we note on that point that the trial court advised Dixon, among other things, that she had the right to testify, "nobody c[ould] stop [her] or prevent [her] from testifying," and Dixon "and not [her] lawyer [was] the one who decides whether or not" she would testify. The trial transcript shows that Dixon confirmed that she understood and that she "personally" did not want to testify.

Dixon also mentions in passing in her appellate brief that she testified at the motion for new trial hearing that trial counsel met with her only a handful of times before trial and "refused to consider evidence she believed was exculpatory." To the extent she seeks to raise claims of ineffectiveness on these grounds, she offers no argument to support them. Thus, any such claims are deemed abandoned under Supreme Court Rule 22. See, e.g., *Byrd v. State*, 321 Ga. 222, 225–27 (2025).

testimony on direct examination that she and Smith encountered Dixon at a ballfield and noticed that Dixon was "pointing" at them; the sister also said that she took a baseball bat to the ballfield "[i]n case [Dixon] came up there and tried to jump on [Smith]." On cross-examination, Dixon's counsel asked Smith's sister about the timeframe during which she and Smith encountered Dixon; counsel also elicited the sister's testimony that she had never heard Dixon threaten Smith and that Smith carried a gun because the neighborhood where she lived was dangerous. On redirect, the prosecutor said that the sister "mentioned being [at the ballfield] for protection," i.e., to protect Smith from Dixon, and asked, "Between the two of you [the sister and Smith], who would have been the one to respond to any kind of aggression?" Dixon's counsel objected on the ground that the question went beyond the scope of his cross-examination; the trial court overruled the objection. The sister replied, "Me."

Assuming without deciding whether the trial court abused its discretion by overruling Dixon's objection, we conclude that any such

13

error was harmless. "A non-constitutional error is harmless if it is highly probable that the error did not contribute to the verdict." *Scott v. State*, 317 Ga. 799, 806 (2023) (quotation marks omitted). The sister's answer to the prosecutor's question was brief, and she conveyed only that Smith was less likely than her to respond to some sort of aggressive conduct. That point was essentially cumulative of other evidence (admitted without objection and unchallenged on appeal) that Smith did not have a reputation for violence, including the sister's testimony on direct examination that Smith did not have a reputation for being aggressive and Duehart's similar testimony that he had never known Smith to be aggressive or violent. Thus, it is highly probable that the sister's one-word answer to the prosecutor's question did not contribute to the verdict. See, e.g., id. (assuming without deciding that the trial court abused its discretion by admitting certain testimony and concluding that any error was harmless because the testimony was cumulative of other evidence at trial); *Monroe v. State*, 315 Ga. 767, 779 (2023) (assuming without deciding that the admission of certain testimony was erroneous and

14

holding that any error was harmless because the testimony was brief and cumulative of other evidence).

5. Finally, Dixon claims that the trial court abused its discretion by overruling her request to strike certain testimony from the medical examiner on the ground that the prosecutor did not comply with OCGA § 17-16-4(a)(4), which provides, as pertinent here, that the prosecutor shall permit the defense to inspect and copy an expert witness's "report of any physical or mental examinations and of scientific tests or experiments," or "[i]f the report is oral or partially oral," the prosecutor "shall reduce all relevant and material oral portions of such report to writing and shall serve opposing counsel with such portions." As explained below, this claim fails.

During the prosecutor's direct examination of the medical examiner, who was qualified as an expert witness, the prosecutor sought to elicit the examiner's testimony about her review of the photographs of the injury to Dixon's forehead after the stabbing and whether that injury was a gunshot wound. Dixon's trial counsel

15

objected, arguing that although the State had provided the defense with the medical examiner's autopsy report, the State had not provided a report regarding the examiner's opinion about the cause of Dixon's forehead injury. See OCGA § 17-16-4(a)(4). Outside of the presence of the jury, the prosecutor conceded that no such report was provided, and the trial court sustained the objection and excluded the medical examiner's opinion about Dixon's injury.

The jury was then brought back into the courtroom, and the prosecutor asked the medical examiner about the differences between stab wounds and gunshot wounds. The examiner testified that stab wounds are "usually linear in shape" while gunshot wounds are "round or ovoid in shape" and "have a marginal abrasion." The prosecutor also elicited the medical examiner's testimony that a "graze gunshot wound" is often "an elongated kind of oval shape" and is "very superficial" because "it just scrapes along the skin surface." When the prosecutor then asked whether a graze gunshot wound would look different than a cut, Dixon's counsel objected and moved "to strike this testimony." The trial court

16

sustained the objection and said that it was "not going to strike anything." The prosecutor then ended her direct examination.

Notably, the trial court sustained Dixon's objection to the medical examiner's testimony about her examination of the photographs of Dixon's injury and whether that injury was a gunshot wound, and the prosecutor did not ask any further questions about the examiner's review of the photos or her opinion about the cause of Dixon's injury.[3]   Rather, the prosecutor asked only about the general differences between stab wounds and gunshot wounds, and the medical examiner testified about some of the typical characteristics of those wounds and how they are usually shaped.   The medical examiner's testimony on those points was based entirely upon her own experience studying and observing the general features of various stab wounds and gunshot wounds.  Thus, the testimony did not convey the results of a "physical or mental examination[]" or "scientific test[] or experiment[]" within the

---

[3] We express no opinion as to the trial court's ruling sustaining Dixon's objection to, and thus excluding, the medical examiner's testimony about the photos of Dixon's injury and the cause of the injury.

17

meaning of OCGA § 17-16-4(a)(4), such that disclosure was not required. See *Green v. State*, 307 Ga. 171, 176–77 (2019) (explaining that an expert witness's opinion that was based "almost entirely upon his own observations and measurements of the available evidence, as well as application of established principles of mathematics and physics to those measurements," "did not constitute a 'scientific test or experiment' requiring disclosure" under OCGA § 17-16-4(a)(4)). Because the testimony that Dixon challenges was not subject to the requirements of OCGA § 17-16-4(a)(4), the trial court did not abuse its discretion by deciding not to strike the testimony on the ground that the prosecutor failed to comply with the statute. See *Green*, 307 Ga. at 176–77.[4]

*Judgment affirmed. All the Justices concur.*

---

[4] Dixon also mentions in her brief in this Court that the trial court should have given "some type of limiting instruction" regarding the medical examiner's testimony. Dixon did not ask for a limiting instruction at trial. And she makes no argument in her brief about what any such instruction should have said or why the trial court should have given it. Accordingly, this claim is deemed abandoned under Supreme Court Rule 22. See, e.g., *Byrd*, 321 Ga. at 225–27.